USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 95-1560 UNITED STATES OF AMERICA, Appellee, v. ROY FRANKHAUSER, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Patti B. Saris, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge.  _____________ ____________________ Joan M. Griffin, with whom Casner & Edwards were on brief for ________________ _________________ appellant. S. Theodore Merritt, Assistant United States Attorney, with whom ___________________ Donald K. Stern, United States Attorney, was on brief for appellee. _______________ ____________________ April 9, 1996 ____________________ BOWNES, Senior Circuit Judge. Appellant Roy BOWNES, Senior Circuit Judge. ____________________ Frankhauser (Frankhauser) appeals his convictions and sentence for corruptly persuading a witness to destroy or conceal objects with intent to impair their availability for use in an official proceeding, 18 U.S.C. 1512(b)(2)(B) (Count II), endeavoring to obstruct a grand jury investigation, 18 U.S.C. 1503 (Count III), and conspiracy to commit the two substantive offenses, 18 U.S.C. 371 (Count I). As to the convictions, Frankhauser contends that the district court erred under Fed. R. Evid. 404(b) and/or Fed. R. Evid. 403 in admitting evidence from his 1987 trial and conviction for conspiracy to obstruct justice, and that the evidence was insufficient to support any of the counts of conviction. As to his sentence, Frankhauser contends that the district court incorrectly added two points for his role in the offense. We reverse Frankhauser's conviction under section 1503, affirm his convictions under sections 1512 and 371, vacate his sentence and remand for further sentencing proceedings.  I. BACKGROUND __________ In addition to evidence of Frankhauser's conduct in this case, evidence of the following was presented: (1) violations of civil rights laws by Brian Clayton (the underlying investigation in this case); (2) Frankhauser's 1987 trial and conviction for conspiracy to obstruct justice; -2- 2 (3) credit card fraud and other violations of the law by members of the 1984 Lyndon LaRouche presidential campaign (the underlying investigation in the 1987 case). Because we review claims of insufficiency of the evidence, we set forth the evidence in the light most favorable to the government. Frankhauser and Brian Clayton _____________________________ Frankhauser, a self-described political activist, has been a well-known member of the Ku Klux Klan in Pennsylvania since at least the 1960s. Up to the time of trial, he had a local weekly television show, made other public appearances, and gave interviews to the print media in which he openly discussed his beliefs. He also ran what he called the "Legal Defense Fund" out of his home, the purpose of which was to advise and find attorneys for people who claimed that their First Amendment rights were being violated. Frankhauser used his own name in public appearances, but used names other than his own when acting as a representative of the Legal Defense Fund.  Brian Clayton (Clayton) was a twenty-year-old founder of a skinhead organization formed in August of 1993 in Brockton, Massachusetts, called the New Dawn Hammerskins. According to FBI Agent Finn, skinheads espouse white supremacy and separate themselves from non-white and Jewish persons. In February of 1994, Clayton met Frankhauser at the filming of a Geraldo show in which Frankhauser appeared as a -3- 3 representative of the Ku Klux Klan. Clayton appeared in the audience, identified himself as a skinhead, and spoke about his white supremacist and separatist views. Three or four times during March and April of 1994, Clayton called Frankhauser's "speech line," which played a recorded speech. On April 14, 1994, Clayton called Frankhauser's personal line; telephone records introduced at trial reflected an eight-minute conversation.  The Underlying Investigation: Brian Clayton's Crimes ____________________________________________________ FBI Agent Finn testified that between August and October of 1993, in the Brockton/Randolph area, three Jewish temples were spray-painted with anti-Semitic graffiti including a swastika, the SS symbol, a fist labeled "White Power," the phrase "Foreigners Out," and "Ian Stewart," the name of a deceased singer in an English skinhead band. During the same period, a "bashing" incident occurred in which a group of young men in a pick-up truck threw a stick at and shouted a racial epithet at two young African-American girls. The FBI, the Massachusetts State Police, and the Brockton and Randolph police began investigating the incidents in October of 1993. Early in the investigation, a state trooper and a Randolph police sergeant interviewed Clayton at his parents' home where he lived. Clayton showed them his room containing photographs of Adolph Hitler, a poster depicting the Holocaust, various pamphlets and flyers -4- 4 advocating white supremacy, and an arm band with a swastika on it. Clayton denied involvement in the incidents under investigation.  On December 7, 1993, a federal grand jury was convened to investigate the temple desecrations as violations of civil rights laws. On January 14, 1994, Agent Finn visited Brian Clayton's mother, Patricia Clayton (Mrs. Clayton), at her place of work, told her that her son was a suspect in an investigation of temple desecrations, and gave her a subpoena directing Clayton to provide fingerprints and handwriting exemplars to the grand jury. Mrs. Clayton gave the subpoena to her son, and he complied with it on January 18, 1994.  The grand jury investigation stopped in March of 1994, but resumed in May of 1994, after another temple was vandalized on April 30, 1994. At the time of that incident, Clayton was in Florida with his family for his sister's wedding. While there, he had a quarrel with his father during which he said that he would be moving out. On May 7, a few days after the family returned to Massachusetts, Clayton left home for Pennsylvania, where he stayed for a time with Frankhauser and joined the Ku Klux Klan. Evidence Of Frankhauser's Conduct In This Case ______________________________________________ On the morning of Friday, May 13, 1994, Agent Finn and a Brockton police officer visited the Clayton home -5- 5 seeking to question Brian Clayton about the April 30 temple desecration. Mrs. Clayton informed Agent Finn that her son had been in Florida on April 30 and that he had since moved out. Because Agent Finn had been told that Clayton had supplied baseball bats for "bashing" incidents, he asked Mrs. Clayton if her son had any bats. Mrs. Clayton replied that he did, then, at Agent Finn's request, she signed a form consenting to a search of Brian's bedroom and another room that also contained his belongings. There, Agent Finn observed five baseball bats, various fliers and pamphlets espousing white supremacy, three flags -- a confederate stars and bars flag, a POW/MIA flag with a white power symbol affixed to it, and a swastika flag -- on the ceiling, and a photograph of Adolph Hitler and news clippings about the 1993 temple desecrations and other vandalism and bias incidents on the walls. According to Agent Finn, some of the symbols and slogans on the objects in Clayton's rooms were similar to those spray painted on the temples, and a confederate flag was reported to have been flying from the truck involved in the "bashing" incident. Although the consent form Mrs. Clayton signed said that he could take anything he wished, Agent Finn did not take anything because he was not confident that Mrs. Clayton's consent was sufficient to permit a search of her son's rooms. He did take twenty-nine political fliers from the living room. -6- 6 Later that day, Clayton called his mother at work. During a brief conversation, she told him that Agent Finn had been to the house that day. Frankhauser also spoke to Mrs. Clayton, identifying himself as Ron Miller, an investigator with the Legal Defense Fund and a counselor who helped young people. He said he was not a lawyer, but that he would try to get Brian a lawyer and a polygraph test. Because she was at work and could not talk any longer on the telephone, Mrs. Clayton asked them to call her later at home. Mrs. Clayton did not mention Agent Finn's search during this conversation. That same day, Frankhauser, having obtained Agent Finn's telephone number from Mrs. Clayton's husband, contacted Agent Finn and said that he was Ron Miller of the Legal Defense Fund, which represented Clayton. Agent Finn testified that Frankhauser told him where Clayton was, and that Clayton would not speak to him without counsel but would surrender himself to Special Agent Reighley at the Allentown, Pennsylvania, office of the FBI if an arrest warrant were to issue. Agent Finn did not testify that he told Frankhauser that he was acting on behalf of a grand jury or that a grand jury was investigating Clayton. That night, Frankhauser and Clayton called Mrs. Clayton at home as she had asked. She testified that Frankhauser (still calling himself Ron Miller) first told her not to worry because he had called Agent Finn and told him -7- 7 where Brian was and that he would try to get him a lawyer and a polygraph test. He then advised her that she had a legal right not to talk to an FBI agent, and asked what questions Agent Finn had asked. She said that he asked if her son owned any baseball bats, and that she answered that he did and then showed the officers Brian's rooms at their request. Frankhauser said that she should not have done so "without a search warrant or subpoena." Frankhauser then told her to "clean out everything that's upstairs in Brian's room, get rid of everything, because the FBI will be back with a search warrant." Mrs. Clayton responded that she did not think the officers would be back, and Frankhauser said: "Do you want to be responsible for putting your son in jail? If you don't clean everything out of that room, they'll have all that evidence against Brian, even though you and I both know he's innocent, but that won't matter to the FBI because they'll use all this against him." He then told Mrs. Clayton to pack "anything that had anything to do with Naziism, skinheadism, anything like that" in boxes marked "Antiques," advising that the "FBI will never open it because they'll know it's your property and they are only interested in Brian's stuff." When Mrs. Clayton said that she could not lie by hiding the things in boxes, Frankhauser again asked if she would like to be responsible for putting her son in jail, and urged her to "get that room all cleaned out" before the agents returned -8- 8 with a search warrant. At some point during this conversation, either before or after Frankhauser offered his advice, Brian Clayton took the telephone and told his mother to throw away all of the news clippings on the walls.  Over the weekend, Mrs. Clayton did not put anything in boxes, but put all of the items on the walls and the ceiling -- the news clippings, the flags and the pictures of Hitler -- in the trash, which was picked up at 6:00 A.M. on Monday morning. Later on Monday morning, Agent Finn returned with a search warrant listing the items he had seen that he considered to be relevant to the investigation. In case Mrs. Clayton had moved the items, he also brought a subpoena directing her to appear before the grand jury on May 17 and to bring with her the same items. Mrs. Clayton told Agent Finn that she had thrown the things on the walls and ceiling away. Agent Finn took five baseball bats and two trash bags full of pamphlets, fliers, newsletters, photographs, arm bands and other clothing. He did not attempt to retrieve the items that had been picked up with the trash that morning. Mrs. Clayton appeared before the grand jury on May 17, then agreed to cooperate with the government by making further telephone calls to Ron Miller and recording them. During the course of two recorded telephone conversations that same day, Mrs. Clayton told Frankhauser -9- 9 (who identified himself as "McGreen" in one call and "Ron Miller" in another) that she had been served with a subpoena and described it to him. Frankhauser's first response was that Brian should be represented by an attorney "at this point" and would "not talk to anyone without an attorney, not even you." He told her to contact the Federal Defender and explain that she may be the subject of a grand jury investigation and to follow his advice, that she should tell the grand jury that she no longer possessed the things other than the baseball bats but to bring the baseball bats, and that it would have been illegal to dispose of the items after a subpoena issued, but she had not violated the law because no subpoena had issued. He added that he wished she'd thrown away the baseball bats too, but "that's alright, there's nothing wrong with baseball bats." In addition, Frankhauser questioned Mrs. Clayton about whether her son really was with her in Florida, referring to the April 30 temple desecration about which Agent Finn had questioned her. When Mrs. Clayton assured him that he was, Frankhauser replied, "Then you know he's innocent, don't you."  In July of 1994, the grand jury indicted Brian Clayton for conspiracy to violate civil rights and conspiracy to intimidate and interfere with federally protected activities on account of race, based on the temple desecrations and "bashing" incidents in the latter part of -10- 10 1993. Special Agent Reighley arrested Clayton in Pennsylvania at his place of work, after getting the address from Frankhauser. Clayton laterpled guilty tothe indictment.1 The 1987 "LaRouche" Case2 ________________________ In 1987, Frankhauser was convicted after a jury trial of one count of conspiracy to commit the offense of obstruction of justice, 18 U.S.C. 1503, in violation of 18 U.S.C. 371. In the trial of the case now before us, the government was permitted to introduce the following from the 1987 trial: (1) the indictment; (2) testimony of FBI Special Agent Egan, the case agent and a witness in the prior trial; (3) a re-enacted portion of the transcript testimony of Forrest Fick, a government witness in the prior trial who was unavailable to testify in the present trial;3 (4) a report authored by Frankhauser; (5) the jury instructions; and (6) a certified copy of the judgment of conviction.  The relevant facts underlying the 1987 case were as follows. Frankhauser, who worked as a security consultant to the 1984 Lyndon LaRouche presidential campaign and related  ____________________ 1. No evidence of Clayton's guilty plea and resulting conviction was presented to the jury. 2. The 1987 case was entitled United States v. Frankhauser, ____________________________ but we refer to it as the "LaRouche" case, as the parties have throughout trial and in this appeal. 3. Agent Finn read Fick's testimony, with the prosecutor reading the direct examination questions and defense counsel reading the cross examination questions. -11- 11 organizations, learned that a grand jury was investigating the organizations and several of their members for defrauding credit card holders by making unauthorized charges to their accounts, and that subpoenas had been served on depository banks for processed credit card slips. Frankhauser then suggested that the organization destroy records to avoid their being subpoenaed. A few months later, subpoenas were served on the LaRouche organizations, and the LaRouchites destroyed records a few days later. As part of a 39-page jury instruction, the district court in Frankhauser's 1987 trial instructed the jury that the following, among other things, constituted obstruction of justice: (3) destroying documents for which a grand jury has not yet issued a subpoena but as to which the person or persons involved in the destruction know that a subpoena is likely; (6) counseling, encouraging or suggesting the destruction or burning of documents or records . . . which the person acting knows are likely to be subpoenaed.4  Frankhauser was found guilty and sentenced to three years' imprisonment. II. FEDERAL RULES OF EVIDENCE 404(b) AND 403 ________________________________________  ____________________ 4. We express no opinion as to whether these instructions continue to correctly describe a violation of section 1503 after United States v. Aguilar, __ U.S. __, 115 S. Ct. 2357 _________________________ (1995), decided after the trial of this case, because Frankhauser has not raised that particular issue and, in any event, we find that there was insufficient evidence that Frankhauser violated or conspired to violate section 1503.  -12- 12 In denying Frankhauser's motion in limine to __ ______ exclude the LaRouche evidence under Fed. R. Evid. 404(b) and Fed. R. Evid. 403, the court ruled that it was admissible as "probative of defendant's knowledge of the law concerning destruction of evidence," and that "its probative value is not substantially outweighed by the danger of unfair prejudice." In terms of the issues in the case, it was admitted for two purposes: (1) to show that Frankhauser acted with corrupt motive and specific intent to violate the law, an essential element of each of the charged crimes; and (2) to refute that Frankhauser had a good faith belief, as he stated to Mrs. Clayton on May 17, that it was not illegal to discard objects not yet under subpoena. The court instructed the jury that it could not consider the evidence as proof that Frankhauser had a bad character or that he endeavored to obstruct justice in 1994, but that it could, but need not, infer from it that Frankhauser "acted knowingly and intentionally and not because of some mistake, accident or other innocent reasons."5 We review a trial court's determination that evidence of prior bad acts is admissible under Rules 404(b) and 403 of the Federal Rules of Evidence for abuse of  ____________________ 5. The government intimates that the evidence was also admissible to establish a pattern, but the jury was not so instructed, so we do not consider that theory of admissibility. -13- 13 discretion. United States v. Guyon, 27 F.3d 723, 729 (1st _______________________ Cir. 1994). It is well-established that evidence of prior bad acts is inadmissible to show bad character and consequent propensity to commit a crime, but may be admitted to prove, among other things, knowledge, intent, or absence of mistake or accident. Fed. R. Evid. 404(b); see also, e.g., United ___ ____ ____ ______ States v. Aguilar-Aranceta, 58 F.3d 796, 798 (1st Cir. 1995); __________________________ United States v. Arias-Montoya, 967 F.2d 708, 709 (1st Cir. ______________________________ 1992). Although logically relevant, "propensity" or "bad character" evidence carries an unacceptable risk that a jury will convict for crimes other than those charged, or that it will convict, although uncertain of guilt, because a bad person deserves punishment. Arias-Montoya, 967 F.2d at 709; _____________ United States v. Moccia, 681 F.2d 61, 63 (1st Cir. 1982). ________________________ Such evidence therefore is inadmissible as a general rule, but may be admissible if it has "special" probative value beyond mere relevance that does not derive from "bad character" or "propensity." Arias-Montoya, 967 F.2d at 709; _____________ Moccia, 681 F.2d at 63. ______ This Circuit applies a two-part test to determine whether a district court abused its discretion in admitting evidence of prior bad acts. First the evidence must overcome the "absolute bar" of Fed. R. Evid. 404(b) by being specially probative of an issue in the case -- such as intent or knowledge -- without including bad character or propensity as -14- 14 a necessary link in the inferential chain. See Aguilar- ___ ________ Aranceta, 58 F.3d at 798; Arias-Montoya, 967 F.2d at 710; ________ _____________ United States v. Ferrer-Cruz, 899 F.2d 135, 137 (1st Cir. _____________________________ 1990). Probative value "must be considered in light of the remoteness in time of the other act and the degree of resemblance to the crime charged." United States v. Fields, ________________________ 871 F.2d 188, 197 (1st Cir.), cert. denied, 493 U.S. 955 ____ ______ (1989). If the proffered evidence has "special relevance," it is nonetheless inadmissible if its probative value is "substantially outweighed by the danger of," inter alia, _____ ____ "unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; Aguilar-Aranceta, 58 F.3d at 798. ________________ "The trial judge . . . must weigh the special relevance against the prejudicial risk, taking into account the likely hostile jury reaction that underlies the common law rule." Moccia, 681 F.2d at 63. ______ Frankhauser argues, as he did at trial, that the evidence about his 1987 trial and conviction was not probative of his knowledge, intent or absence of mistake in this case because the main focus of the earlier case was the destruction of documents by others three days after a subpoena had issued. His conduct -- the pre-subpoena advice -- was charged as an overt act which may or may not have been illegal in itself. To convict him of the conspiracy, the 1987 jury need not have found that his advice was illegal as -15- 15 long as it found that he joined in a conspiracy to destroy documents after a subpoena issued. He argues that his conviction in that case therefore did not inform him that pre-subpoena advice to destroy evidence or pre-subpoena destruction of evidence was illegal. Frankhauser points out that the only mention of pre-subpoena destruction of evidence in the 1987 trial was in a jury instruction that did not fit the facts of the case. In addition, Frankhauser argues, his prior conduct took place ten years before his telephone conversation with Mrs. Clayton in 1994, and he was tried for it seven years before that conversation. He argues that the remoteness in time lessened the probative value of the prior bad act evidence, Fields, 871 F.2d at 198; United States v. ______ _________________ Lynn, 856 F.2d 430, 435 (1st Cir. 1988), especially because ____ the relevance of the evidence depended on a "once burned, twice shy" chain of inferences. See Aguilar-Aranceta, 58 ___ ________________ F.3d at 801. Frankhauser argues that, given the remoteness in time and the dissimilarity between the charges, the evidence should have been excluded.  For its part, the government argues that the jury could permissibly infer from Frankhauser's own conduct in the ___ 1984 conspiracy, which was advising the destruction of records for the express purpose of avoiding a subpoena and not their actual destruction, the 1987 jury instruction stating that it is obstruction of justice to counsel -16- 16 destruction of documents before a subpoena arrives while knowing a subpoena is likely, and Frankhauser's conviction, that he knew that advising someone to dispose of documents before a subpoena issued for the express purpose of avoiding a subpoena was illegal, and that he therefore acted corruptly with the specific intent to violate the law in 1994. That inferential chain would not include Frankhauser's character as a necessary link. Ferrer-Cruz, 899 F.2d at 137. The ___________ government also contends that the jury could conclude from the 1987 instruction stating that it is obstruction of justice to destroy documents before a subpoena arrives that Frankhauser did not have a good faith belief, as he stated to Mrs. Clayton, that the opposite was true. The government argues that the passage of time would not lessen the probative value particularly of the instruction regarding counseling destruction of documents because that instruction fit Frankhauser's own conduct in the case and his conviction and sentence for that conduct after a severed trial likely made a lasting impression on him.  We find that the district court did not abuse its discretion in finding that the theory under which the 1987 evidence was offered did not run afoul of Fed. R. Evid. 404(b) because the conduct charged in 1987 was very similar to that charged in 1994, with certain differences that could be explained to the jury. The remoteness in time did lessen -17- 17 the overall probative value of the evidence, but not appreciably, with one exception -- the jury instruction stating that it was obstruction of justice to destroy evidence before a subpoena issued was not very probative to refute Frankhauser's stated belief that discarding objects not yet under subpoena was legal, as it was only a small portion of a lengthy seven-year-old instruction that did not fit the facts of the case in which it was given.  Our most serious concerns rest on the Rule 403 side of the scale. "If the evidence brings unwanted baggage, say, unfair prejudice or a cognizable risk of confusing the jury, and if the baggage's weight substantially overbalances any probative value, then the evidence must be excluded." Aguilar-Aranceta, 58 F.3d at 800 (internal quotation marks ________________ and citations omitted). The author of this opinion believes that although the LaRouche evidence was probative in theory, the use and extent of it "progressed well beyond the necessary," United States v. Pratt, 73 F.3d 450, 452 (1st _______________________ Cir. 1996), and that this raised a threat of confusion and unfair prejudice.6 The other two judges believe that there  ____________________ 6. Once the district court finds that evidence of a prior bad act is probative, it has an obligation to limit the evidence to what is legitimately necessary. Evidence of two obstruction of justice cases was presented in this trial, each of which was two cases in one. The jury had with it three different indictments during its deliberations. One third of the trial transcript and four of nineteen government exhibits were devoted to the LaRouche case. The case agent described numerous crimes committed by the LaRouche -18- 18 was adequate justification for the admission of at least the bulk of the evidence. While it behooves us once again to warn the government and the district court against "the folly of bad act overkill," Arias-Montoya, 967 F.2d at 714, we all _____________ agree that in this case it is "highly probable" that whatever portion of the LaRouche evidence that was unnecessarily admitted "did not contribute to the verdict[s]" on Count I (conspiracy) and Count II (18 U.S.C. 1512). Aguilar- ________ Aranceta, 58 F.3d at 802; Arias-Montoya, 967 F.2d at 714; see ________ _____________ ___ also Kotteakos v. United States, 328 U.S. 750, 764-65 (1946). ____ __________________________ Even aside from the 404(b) evidence, the evidence supporting the requisite state of mind with respect to Counts I and II was strong and uncontradicted, see Parts IV and V, infra, and ___ _____  ____________________ organizations and individuals, with which Frankhauser was not charged. Only enough evidence to explain the context of the obstruction -- that there was an investigation of credit card fraud -- was required. In other four-layered obstruction of justice cases, the evidence of prior obstructive conduct was not nearly so extensive as that here. See United States v. ___ _________________ Arnold, 773 F.2d 823, 833 (7th Cir. 1985); United States v. ______ ________________ Moree, 897 F.2d 1329, 1333 (5th Cir. 1990). A multitude of _____ collateral factual issues was relitigated, necessitated by the extent and detail of the evidence the government was allowed to present. This created a danger of confusing the jury, distracting it from the main issues it had to decide, and misleading it into placing too much importance on the LaRouche case. See J. Weinstein & M. Berger, 1 Weinstein's ___ ___________ Evidence, 403[04], at 403-59 to 403-67 (1995); United ________ ______ States v. Glecier, 923 F.2d 496, 503 (7th Cir.), cert. ___________________ ____ denied, 502 U.S. 810 (1991); Kinan v. City of Brockton, 876 ______ __________________________ F.2d 1029, 1034-35 (1st Cir. 1989); United States v. __________________ Pitocchelli, 830 F.2d 401, 403-04 (1st Cir. 1987). The trial ___________ court should have taken care to limit the extent and some of the content of the LaRouche evidence, especially given the welter of issues in this case that might have invited a jury to convict irrationally. -19- 19 we reverse the conviction on Count III (18 U.S.C. 1503). See Part III, infra. We therefore decline to hold that the ___ _____ admission of the LaRouche evidence was prejudicial error. III. OBSTRUCTION OF JUSTICE ______________________ Frankhauser contends that there was insufficient evidence that he violated the so-called "omnibus" clause of 18 U.S.C. 1503 under which he was charged and convicted, which provides in relevant part that it is a crime to "corruptly . . . endeavor[] to influence, obstruct, or impede, the due administration of justice." In assessing a claim of insufficiency of the evidence, we examine the record in the light most favorable to the verdict, drawing all reasonable inferences and credibility determinations in its favor, in an effort to ascertain whether the proof would allow a rational jury to find every essential element of the crime charged beyond a reasonable doubt. United States v. _________________ Lanoue, 71 F.3d 966, 982 (1st Cir. 1995); United States v. ______ ________________ Victor, 973 F.2d 975, 977-78 (1st Cir. 1992).  ______ Frankhauser, principally relying on United States ______________ v. Aguilar, __ U.S. __, 115 S. Ct. 2357 (1995), a case __________ decided by the Supreme Court after his trial, argues that there was insufficient evidence that his advice to Mrs. Clayton had the natural and probable effect of interfering with a pending grand jury investigation, or that he knew or intended that his advice would interfere with a pending grand -20- 20 jury investigation. At most, Frankhauser argues, a rational jury could conclude that his advice had the natural and probable effect of interfering with a search by an FBI agent, and that all he knew or intended was that his advice would interfere with an FBI search. We need not reach the question whether, had Frankhauser known of the grand jury investigation, the advice he offered to Mrs. Clayton would have been sufficient to support a conviction under the statute. Aguilar reaffirmed _______ the proposition that a defendant may be convicted under section 1503 only when he knew or had notice of a pending proceeding. Id. at 2362 (citing Pettibone v. United States, __ __________________________ 148 U.S. 197, 206 (1893)). After scouring the record in this case, we are unable to find any evidence that Frankhauser knew or had notice of the pending grand jury proceeding in Massachusetts. To be sure, he knew that the FBI was investigating Brian Clayton, but the government has pointed to no evidence (and we have found none) that he knew that the investigation was connected to a grand jury. The government points to two pieces of evidence to support the inference that Frankhauser knew about the grand jury. The first is Mrs. Clayton's testimony that Frankhauser said he expected that the FBI agent would return, in her words, "with a subpoena or search warrant, I'm sorry." She also testified that he said the agent would be back, again in -21- 21 her words, "with the subpoena -- I mean the search warrant, I'm sorry." Even on a cold record it is evident that Mrs. Clayton's reference to a subpoena was a misstatement, and that in fact she intended to refer only to a search warrant. But even if this statement could be read to refer to a subpoena as well, there is no way to infer from this that Frankhauser knew that a grand jury proceeding was underway, rather than a possibility for the future. Second, the government argues that testimony by Frankhauser's step-daughter supports the proposition that Frankhauser knew that Brian Clayton was under investigation by a federal grand jury. Yet this testimony referred only to an "investigation," and we see no way the jury could have inferred that the investigation was by a grand jury rather than by the FBI. Without stronger evidence of Frankhauser's knowledge of the pending grand jury proceeding, his conviction on this count cannot stand. We therefore reverse his conviction on Count III. IV. CORRUPTLY PERSUADING A WITNESS ______________________________ Frankhauser also argues that there was insufficient evidence from which a rational jury could conclude beyond a reasonable doubt that he violated 18 U.S.C. 1512(b)(2)(B), which provides in relevant part that it is a crime to "knowingly . . . corruptly persuade[] another person . . . or engage[] in misleading conduct toward another person, with -22- 22 intent to . . . cause or induce any person to . . . destroy . . . or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding." Both a federal trial and a federal grand jury investigation are "official proceedings" within the meaning of the statute. See 18 U.S.C. 1515(a)(1)(A). In contrast to section 1503, ___ "an official proceeding need not be pending or about to be instituted at the time of the offense." 18 U.S.C.  1512(e)(1). Frankhauser argues that even assuming that his statements to Mrs. Clayton on May 17 that she had not violated the law by discarding items not yet under subpoena were intentionally misleading, there was no evidence that in making those statements he intended to induce her to destroy or conceal any evidence in addition to what she already had put out with the trash. We agree and the government concedes that there was a lack of evidence that Frankhauser intended to induce any further action on May 17. The statute, however, can be violated not only by engaging in misleading conduct, but also by corruptly persuading a person to destroy or conceal an object with the specific intent to impair the object's availability for use in an official proceeding.  As to the "corrupt persuasion" prong of section 1512(b)(2)(B), Frankhauser reiterates that there was insufficient evidence that his advice to Mrs. Clayton on May -23- 23 13 was directed at an official proceeding rather than just an FBI search. Because an official proceeding need not be pending or about to be instituted at the time of the corrupt persuasion, the statute obviously cannot require actual knowledge of a pending proceeding. On the other hand, the defendant must act knowingly and with the intent to impair an object's availability for use in a particular official proceeding. 18 U.S.C. 1512(b)(2)(B); United States v. _________________ Murphy, 762 F.2d 1151, 1154 (1st Cir. 1985) (section 1512 ______ indictment was defective for failing to identify the proceeding the defendants allegedlyattempted to influence).  We have not yet had occasion to decide what state of mind a defendant must have with respect to an official proceeding in order to violate section 1512 in a case where, as here, there is insufficient evidence that the defendant knew that an official proceeding was currently pending. Cf. __ Victor, 973 F.2d at 978 (sufficient evidence that defendant ______ intended to prevent further testimony in a federal proceeding where, inter alia, defendant told witness that he "talked too _____ ____ much in the federal court"). In United States v. Shively, _________________________ 927 F.2d 804 (5th Cir.), cert. denied, 501 U.S. 1209 (1991), ____ ______ the Fifth Circuit grappled with the issue in a case where the defendants had committed arson and filed suit in state court to collect from their insurance company, and then acted in a threatening way toward a deposition witness and his wife. -24- 24 The record was silent as to when the grand jury began investigating the arson, and whether the witness or his wife ever testified before the grand jury. Although federal investigators had become involved in the case before the defendants' intimidating conduct and there was evidence that their co-conspirator in the arson knew that federal investigators were involved, there was no evidence that the defendants knew it. The Shively court found that there was _______ insufficient evidence that the defendants acted with intent to influence an official proceeding rather than the state civil proceedings, reasoning that "without at least a circumstantial showing of intent to affect testimony at some particular federal proceeding that is ongoing or is scheduled to be commenced in the future, this statute does not proscribe his conduct." Id. at 812-13. In United States v. __ _________________ Conneaut Indus., Inc., 852 F. Supp. 116 (D.R.I. 1994), Judge _____________________ Pettine acknowledged Shively, but took it a step further to _______ allow conviction under section 1512(b)(2)(B) in a case where the defendant's office manager had instructed a secretary to remove documents after another employee had been fired for price fixing, but before an official proceeding had commenced or been scheduled. The office manager's instructions were "strong circumstantial evidence that she certainly intended to affect, indeed bury, testimony and gave those instructions because she realized that a federal proceeding could be -25- 25 commenced in the future." Id. at 125. Judge Pettine held __ that "the language of the statute . . . encompass[es] an investigation that the involved individual has reasonable cause to believe may be about to commence." Id.  __ We do not adopt the Shively opinion insofar as it _______ may indicate that a defendant in every case must actually know that an official proceeding has been commenced or scheduled. Nor do we adopt the Conneaut opinion insofar as ________ it might be read as allowing conviction in any case where there is some circumstantial evidence that the defendant may have foreseen an official proceeding at some time in the future. Each case must be evaluated on its own facts.  Here, the evidence that Frankhauser intended to interfere with an identifiable official proceeding went beyond that in either Shively or Conneaut. There was no _______ ________ dispute that on May 13 Frankhauser knew that the FBI was investigating Brian Clayton. His warnings to Mrs. Clayton that her son could go to jail unless she followed his instructions, and his statement to Agent Finn that Clayton would surrender himself if an arrest warrant were to issue, were direct evidence that he in fact expected a grand jury investigation and/or a trial in the foreseeable future, and that his intent was to make the items unavailable for use in such a proceeding or proceedings. His prior conviction for participating in a conspiracy to obstruct justice by advising -26- 26 the destruction of documents gave him notice that his advice to Mrs. Clayton was illegal, thus establishing that he acted with corrupt intent to violate the law.  Frankhauser further argues that there was insufficient evidence that he intended Mrs. Clayton to rely on his advice rather than that he intended that she seek independent legal counsel before deciding what action to take. This argument is unavailing for the simple reason that Mrs. Clayton testified that Frankhauser first encouraged her to consult with a lawyer on May 17, four days after he gave his advice and she acted on it. -27- 27 V. CONSPIRACY __________ Frankhauser argues that there was insufficient evidence from which a rational jury could conclude that he conspired with Brian Clayton to violate section 1503 or section 1512, reiterating his arguments that he lacked the requisite intent to violate either statute, and contending that the mere fact that they participated together in a telephone conversation with many lawful objectives, such as telling Mrs. Clayton that Agent Finn had been informed of her son's whereabouts, was not enough to show that they conspired together with the specific intent to interfere with the administration of justice or to induce Mrs. Clayton to make evidence unavailable for use in an official proceeding.  In order to prove a conspiracy under section 371, the government must prove the existence of a conspiracy, the defendant's knowledge of and voluntary participation in it, and the commission of an overt act in furtherance of the agreement. United States v. Yefsky, 994 F.2d 885, 890 (1st ________________________ Cir. 1993); United States v. Gomez, 921 F.2d 378, 380 (1st _______________________ Cir. 1990). The agreement need not be proved to have been explicit, and may be proved by circumstantial evidence. See ___ Direct Sales Co. v. United States, 319 U.S. 703 (1943); _____________________________________ Glasser v. United States, 315 U.S. 60, 80 (1942). To prove _________________________ voluntary participation, the government must prove that the defendant had "an intent to agree and an intent to effectuate -28- 28 the commission of the substantive offense." United States v. ________________ Piper, 35 F.3d 611, 615 (1st Cir. 1994).  _____ The evidence of the chain of events on May 13 was sufficient to establish an agreement to corruptly persuade Mrs. Clayton to conceal and discard the objects in Clayton's rooms in order to impair their availability for use in an official proceeding. Frankhauser and Clayton learned that Agent Finn was seeking to question Clayton about the April 30 temple desecration and that he had searched Clayton's rooms. In Clayton's presence, Frankhauser said that he expected Agent Finn to return with a search warrant, and that Clayton could go to jail. Frankhauser and Clayton each instructed Mrs. Clayton to take some action with respect to the objects in Clayton's rooms -- Frankhauser told her to pack things to do with Naziism or skinheadism in boxes or "get rid of" them, and Clayton told her to throw the news clippings away. While the insufficiency of the evidence that Frankhauser knew about a pending grand jury investigation would preclude a conviction for conspiracy to violate section 1503, a rational jury could find that there was a meeting of the minds with respect to impairing the availability of the objects in Clayton's rooms for use in an official proceeding, which both Frankhauser and Clayton expected, in violation of section 1512(b)(2)(B).  -29- 29 VI. THE SENTENCE ____________ The district court added 2 levels to Frankhauser's base offense level pursuant to U.S.S.G. 3B1.1(c) for his role in the offense, finding that he was a supervisor or organizer of Clayton.7 Frankhauser appeals the upward role adjustment. The government bears the burden of proving facts to justify such an enhancement by a preponderance of the evidence. United States v. Piedrahita-Santiago, 931 F.2d _____________________________________ 127, 132 (1st Cir. 1991). Because the sentencing court's determination of a defendant's role in an offense is heavily fact-dependent, it will be set aside only for clear error, United States v. Shrader, 56 F.3d 288, 293 (1st Cir. 1995), ________________________ unless a mistake of law was made, in which case we remand with appropriate instructions. 18 U.S.C. 3742(f)(1); United States v. Tejada-Beltran, 50 F.3d 105, 110-11 (1st _________________________________ Cir. 1995); United States v. Fuller, 897 F.2d 1217, 1220 (1st _______________________ Cir. 1990). The Guidelines provisions pertaining to role adjustments are as follows: When an offense is committed by "more than one participant," a role adjustment may, but need not, apply. U.S.S.G. Ch. 3, pt.B, intro. comment. A  ____________________ 7. Before the two-point addition, the base offense level was 12 according to U.S.S.G. 2J1.2(a). With a Criminal History Category of III, a total offense level of 14 resulted in a sentencing range of 21 to 27 months. The court sentenced Frankhauser to 25 months imprisonment and 36 months of supervised release on each count, to run concurrently. -30- 30 "participant" is a "person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. 3B1.1, comment.(n.1). The range of adjustments in section 3B1.1 is based on "the size of a criminal organization (i.e., the number of participants in ____ the offense) and the degree to which the defendant was responsible for committing the offense." U.S.S.G. 3B1.1, comment. (backg'd.). These adjustments are included "primarily because of concerns about relative responsibility." Id. "Many offenses are committed by a __ single individual or by individuals of roughly equal culpability so that none of them will receive an adjustment under this Part." U.S.S.G. 3B1.4, comment. "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity [involving more than one but less than five participants and was not otherwise extensive], increase by 2 levels." U.S.S.G. 3B1.1(c). This adjustment "does not apply to a defendant who merely suggests committing the offense." U.S.S.G. 3B1.1, comment.(n.4).  Here, the court found that Frankhauser was a supervisor or organizer of Brian Clayton, the only other "participant" in the offense of conviction. In order to qualify under U.S.S.G. 3B1.1(c) as a supervisor or organizer in criminal activity involving less than five participants that is not otherwise extensive, the evidence -31- 31 must support that the defendant "exercised control over these persons or was otherwise responsible for organizing them in the commission of the offense." Fuller, 897 F.2d at 1221; ______ see also United States v. Webster, 54 F.3d 1, 8 (1st Cir. ___ ____ _________________________ 1995) (same). The government urges that there need not have been evidence that Frankhauser exercised control over Clayton based on our statement in Tejada-Beltran, 50 F.3d 105, that ______________ "retention of control over other participants, although sometimes relevant to an inquiry into the status of a putative organizer, is not an essential attribute of organizer status." Id. at 113. Tejada-Beltran considered __ ______________ whether direct control over other participants in an "extensive criminal enterprise" was necessary to establish organizer status under U.S.S.G. 3B1.1(a), not section 3B1.1(c). We held in that context that the key "is not direct control but relative responsibility," such as when "the organizer stages an extensive activity in such a way as to evince an increased degree of relative responsibility." Id. at 112. We defined an organizer in that context as one __ who "forms diverse elements into a whole consisting of interdependent, coordinated parts, geared for concerted action." Id. at 113. See also United States v. Camuti, No. __ ___ ____ ________________________ 94-1222, slip op. at 16 (1st Cir. Mar. 12, 1996) (in order to be found an organizer under 3B1.1(a), not only must "the fraud be extensive but [defendant must] have played an -32- 32 extensive role as an organizer or leader"). We have not extended Tejada-Beltran to a case in which the criminal ______________ activity was not "otherwise extensive," and decline to do so. The court did not adopt the recommendation of the Probation Office against a role adjustment,8 but made findings in open court, United States v. Catano, 65 F.3d 219, _______________________ 229 (1st Cir. 1995), that Frankhauser acted in a supervisory or organizational role. The court relied on the following factors: (1) Frankhauser's motive ("I think Mr. Frankhauser believed that Mr. Clayton was innocent, and I think he was going to take him under his wing. . . . He came to Pennsylvania and I think Mr. Frankhauser wanted to help him, he thought he was innocent, and then he engaged in this scheme with him."); (2) Frankhauser's greater experience in dealing with the FBI ("He knew better than Mr. Clayton what you're supposed to do in these circumstances because he had been through it once before in the Lyndon LaRouche case. . . . I will take into account not that it's age discrimination, but one person just had a heck of a lot more experience in dealing with the FBI than Mr. Clayton who was basically a 20-  ____________________ 8. The Probation Office stated in the Presentence Investigation Report (PSR) that although "Mrs. Clayton received the majority of her instructions regarding the destruction or concealing of evidence from Frankhauser," and "Brian Clayton's involvement was limited to telling his mother to throw away all the news clippings . . . the Probation Office has not been presented with evidence that Frankhauser directed Clayton to give these instructions to Mrs. Clayton."  -33- 33 year-old kid without anything."); (3) the fact that the advice was not spontaneously given in the first conversation on May 13 but that several hours passed between that conversation and the one in which the illegal advice was given; (4) the fact that Frankhauser got on the phone before Clayton did; and (5) Clayton's statement to a fellow skinhead on June 30 that when his mother telephoned after she disposed of the items, Frankhauser told her "they can't do nothing to you because you got rid of it before they served the warrant."  Frankhauser contends that the court improperly relied on his greater experience as compared with Clayton's relative youth, and that there was no evidence that he supervised or organized Clayton in the commission of the offense during the twenty-minute conversation on the night of May 13.  While a defendant's having greater experience than another participant may be a pertinent evidentiary factor supporting an inference that a defendant played a supervisory role, relative age and experience, without more, cannot be the basis for an enhancement under 3B1.1. E.g., United ___ ______ States v. Wihbey, 75 F.3d 761, 777-78 (1st Cir. 1996). We _________________ recognize, as the government urges, that the adjustments in section 3B1.1 are available "primarily because of concerns about relative responsibility," U.S.S.G. 3B1.1, comment. -34- 34 (backg'd.), but greater responsibility must be reflected in the defendant's actions relative to another participant, not in the mere fact of greater experience. The court must focus on what the defendant did, in relation to at least one other ______________________ participant, in the commission of the offense. Compare _______ Fuller, 897 F.2d at 1221 (mere fact that defendant dealt with ______ a large quantity of marijuana did not support a finding that he was an organizer, leader, supervisor, or manager) with, ____ e.g., Wihbey, 75 F.3d 761 (defendant gave orders to another, ____ ______ set timing of drug transaction and received a larger share of the profit). Without a link to a defendant's conduct, a defendant's greater experience would not establish that he acted in a supervisory or organizational role.9 As we have stated before, "upgrading the BOL must be based on more than the trial judge's hunch, no matter how sound [her] instincts or how sagacious [her] judgment." United States v. Ortiz, _______________________ 966 F.2d 707, 717 (1st Cir. 1992), cert. denied, __ U.S. __, ____ ______ 113 S. Ct. 1005 (1993).  We are not confident that the court did not rely too heavily on Frankhauser's greater experience without sufficiently considering whether he "exercised control over  ____________________ 9. We note that Frankhauser's prior experience in dealing with a government investigation, gained through the LaRouche case, was taken into account in two other ways: his conviction in the LaRouche case contributed to his criminal history category and the court sentenced him near the higher end of the range because it was his second similar offense.  -35- 35 [Clayton] or was otherwise responsible for organizing [him] in the commission of the offense." Fuller, 897 F.2d at 1221. ______ That Frankhauser had a motive to protect Clayton in believing that he was innocent only shows that he and Clayton were "of roughly equal culpability," U.S.S.G. 3B1.4, comment., where Clayton had a strong motive of his own and had lied to Frankhauser about his innocence. Nor do the other evidentiary factors relied upon by the court appear to have been "fairly supportive of the two-level increase." Ortiz, _____ 966 F.2d at 717. We therefore vacate the sentence and remand for further sentencing proceedings so that the court may reconsider the role adjustment or make factual findings to support it in light of this opinion. VII. CONCLUSION __________ For the foregoing reasons, we reverse Frankhauser's conviction under 18 U.S.C. 1503, affirm his convictions under 18 U.S.C. 1512 and 18 U.S.C. 371, vacate his sentence and remand for further sentencing proceedings. So ordered. ___________ -36- 36