USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1429

 UNITED STATES,

 Appellee,

 v.

 FRANCIS H. WOODWARD,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Douglas P. Woodlock, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 
 Bownes and Cyr, Senior Circuit Judges.
 
 

 Bruce A. Singal, with whom William C. Athanas, and Donoghue,
Barrett & Singal, P.C., were on brief for appellant.

 John M. Griffin, Assistant United States Attorney, with whom
Mark W. Pearlstein, Acting United States Attorney, was on brief for
appellee.

July 20, 1998

 
 

 BOWNES, Senior Circuit Judge. This case is the sequel to
United States v. Sawyer, 85 F.3d 713 (1st Cir. 1996), as we discuss
in detail infra. Appellant Francis H. Woodward appeals his four-
count conviction for mail and wire fraud, 18 U.S.C. 1341, 1343;
interstate travel to commit bribery, 18 U.S.C. 1952 (the "Travel
Act"); and conspiracy to commit those offenses, 18 U.S.C. 371. 
The charges stem from his acceptance of illegal gratuities from
William Sawyer and others, with the intent of depriving Woodward's
constituents of his honest services as a legislator. In this
appeal, Woodward claims that the evidence was insufficient to
establish his guilt beyond a reasonable doubt on any of the four
counts. He also argues that the district court erred in certain
evidentiary rulings and in its jury instructions. We affirm.
 I
 Facts
 When reviewing an appeal from a conviction, we view the
facts in the light most favorable to the verdict. United States v.
Gonzalez-Maldonado, 115 F.3d 9, 12 (1st Cir. 1997); Sawyer, 85 F.3d
at 731. Francis H. Woodward was first elected to the Massachusetts
House of Representatives in 1977. He was assigned to the Joint
Committee on Insurance ("Insurance Committee"), and served as the
Committee's House Chair from January, 1985 through January 19,
1991. Beginning January 20, 1991 and continuing through April 1992
when he resigned from the legislature, Woodward was assigned to the
Transportation Committee, which had no jurisdiction over insurance
matters.
 During the relevant time period, John Hancock Mutual Life
Insurance Company ("Hancock") was one of the two largest life
insurance companies in Massachusetts, and one of the ten largest in
the entire United States. Because Hancock is domiciled in
Massachusetts and is regulated primarily at the state level,
Massachusetts' laws and regulations have a major impact on Hancock,
affecting such issues as the corporation's organization and
funding. 
 William Sawyer was the senior legislative counsel in
Hancock's Government Relations Department. He was responsible for
lobbying the Massachusetts legislature on behalf of bills favored
by Hancock and the industry, and against those bills they opposed. 
He actively lobbied the Insurance Committee.
 Hancock was also a member of an industry trade
association known as the Life Insurance Association of
Massachusetts ("LIAM"). LIAM also employed lobbyists who worked on
Massachusetts legislation, in coordination with the lobbyists of
its member companies. Sawyer was an active participant in LIAM as
well.
 Bills filed in the Massachusetts legislature were
assigned to committee by subject matter. The Insurance Committee,
comprising eleven representatives and six senators, was one of the
principal legislative committees to which legislation of interest
to Hancock and LIAM was assigned. From 1985 through 1990, the
Insurance Committee received, on average, three hundred bills a
year, one hundred of which affected the life insurance industry. 
Of those bills, the industry was interested in passing an average
of only five per year; it opposed the rest. 
 The committee's procedures were, in general, as follows. 
First, public hearings were held on the bills. Following such
hearings, the members of the committee voted on the bills in
executive sessions that were open to the public. If the bill
received a favorable recommendation in the committee's executive
session, it was reported out favorably for further action on the
floor of either the House or the Senate. If it received an
unfavorable recommendation or a study order in the committee's
executive session vote, then in all likelihood the bill would not
pass in that session.
 The Insurance Committee was co-chaired by one House and
one Senate member. The co-chairs, Woodward and his Senate co-
chair, directed the activities of the committee, supervising the
committee staff and scheduling all public hearings, executive
sessions, and meetings. As co-chair, Woodward had the authority to
assign bills to the hearing calendar and subsequent executive
sessions, and to take other action that would help to advance bills
through the committee (or he could choose not to take such action). 
Woodward also had the authority to affect the disposition of a
bill, including the ability to "carry" a bill through the
legislative process or to send it to "study," which effectively
shelved it. 
 As one of the four most active lobbyists on behalf of
domestic life insurance companies, Sawyer was frequently present at
Insurance Committee meetings. He saw Woodward two or three times
a week, and was the lobbyist who met most often with Woodward. 
After Woodward was removed from the Insurance Committee in January
1991, Sawyer continued to appear at committee meetings and to meet
with Woodward's successor as House Chair with the same frequency as
he had before.
 At the heart of the government's case was the evidence of
Sawyer's expenditures on Woodward for shared meals and
entertainment. From 1984 through 1992, Woodward accepted in excess
of $9,000 in gratuities from Hancock and LIAM through their
lobbyists Sawyer and William F. Carroll, the president of LIAM. 
Hancock provided the majority of this largesse, at least $8,740 in
meals, rounds of golf, and other entertainment.
 The government introduced evidence showing that, from
March 28, 1984 through January 23, 1992, Sawyer expended $8,740 on
behalf of Woodward. Of that total, $1,827 was expended after the
statute of limitations period began, i.e., after July 27, 1990. 
One thousand three hundred forty dollars ($1,340) of the total
expenditures occurred after January 19, 1991, when Woodward was
removed from the Insurance Committee.
 Sawyer's expenditures consisted of (1) shared meals and
entertainment at conferences, generally once or twice a year;
(2) miscellaneous meals and rounds of golf each year in
Massachusetts; (3) a dinner at the annual Fourth of July social
gathering on Cape Cod; and (4) a trip in January 1986 to the Super
Bowl in New Orleans. Expenditures from categories (1) and (2) are
the subject of this appeal on the sufficiency issue. The jury
acquitted Woodward as to category (3) expenditures. Evidence
relating to the Super Bowl was not the subject of the indictment,
but was admitted, over Woodward's objection, to show the nature of
the conspiracy and for its bearing on intent; Woodward appeals the
admission of that evidence.
 The National Conference of Insurance Legislators (COIL)
is a national association of state legislators involved in
insurance matters. Every year the organization sponsored one or
more conferences for legislators, at various sites around the
country, where educational presentations were made concerning
insurance matters. Woodward attended many COIL conferences, as did
other legislators from Massachusetts and elsewhere. Legislators'
travel and hotel expenses were paid from a legislative account or
campaign funds but not by the insurance industry. Woodward and
Sawyer frequently played golf at exclusive clubs near the
conference site, and Sawyer generally paid the costs of the golf. 
Sawyer used his corporate credit card to pay for business-related
expenses. He submitted an expense account statement with receipts,
and Hancock reimbursed Sawyer for such expenses. In addition,
Sawyer paid for a number of dinners at local restaurants that would
be attended by legislators such as Woodward who were attending the
conferences. At times, William Carroll of LIAM would pay for the
dinners. Sawyer/Hancock also paid for Woodward's entertainment
while at these conferences, such as tickets for the Grand Ole Opry
when the conference was in Nashville.
 In addition to the COIL conference expenditures, Sawyer
paid for Woodward's meals at expensive restaurants, as early as
1984, when Woodward was in the Legislature but before Woodward
served as co-chair of the Insurance Committee. This practice
continued throughout the years Woodward remained in the House, with
higher amounts generally in the years he was committee chair. 
Sawyer also paid for an average of three to five golf outings with
Woodward each year at various locations in Massachusetts. These
were principally at Sawyer's private golf club, the Woodland Golf
Club. Hancock also paid for other forms of entertainment,
including boat rentals and tickets to tourist attractions such as
Busch Gardens.
 The government introduced into evidence a chart showing
the amount of annual gratuities accepted by Woodward. The pattern
formed by these amounts is noteworthy. In 1984 and 1985, before
Woodward became chair of the Committee and for the first year
afterward, Woodward accepted gratuities in the range of $200-300
from Sawyer/Hancock. In 1986 there was a marked increase to
$2,527, including over $1,800 to cover the air fare, hotel, and
tickets (for him and his wife) to attend the Super Bowl in New
Orleans. In 1987-91, Woodward received gratuities in the amount of
$1,547, $1,093, $513, $1,230, and $1,324. Woodward served as
committee chair during all but the last of these years. During his
last four months in the legislature, January through April 1992, he
received only $16, and his gratuities dropped to $0 after he
resigned from office in April. After Woodward was replaced as
committee chair by Rep. Francis Mara, Sawyer began wining and
dining Mara in the same manner as he had Woodward. Sawyer, 85 F.3d
at 721.
 In addition to Sawyer's payments on behalf of Woodward,
LIAM lobbyists also paid for some of Woodward's meals during the
period of the charged conspiracy (1984-92). These amounted to
$444.
 Woodward's official actions, for the most part, conformed
with the way Sawyer and Hancock wanted the recipient of their
gratuities to conduct himself. Sawyer was the lobbyist with whom
Woodward met the most, according to Robert J. Smith, the research
director for the Insurance Committee. They met approximately three
times a week when the legislature was in session. And Woodward
repeatedly acted on behalf of Hancock and the life insurance
industry in his capacity as co-chair of the Committee.
 According to Smith, Woodward was the most pro-life-
insurance-industry chair of the Insurance Committee during Smith's
tenure, 1985-95 (which included six other House and Senate chairs). 
Woodward actively supported the industry's position on most bills
of importance to the industry.
 As his defense to the charge that he engaged in illegal
theft of honest services, Woodward presented evidence that Sawyer's
expenditures on his behalf were based not on bribery but on their
"close" friendship. In addition to their business relationship,
Woodward and Sawyer maintained a personal relationship. They met
in the late 1970s, which is the time Woodward began serving on the
Insurance Committee. The two families socialized together even
before Woodward assumed the chair of the Committee in 1984. The
two couples drove together to a conference in New York in 1980, and
the Sawyers and their children visited the Woodwards at the
latter's house on Cape Cod as early as 1982. Beginning in about
1984, the Sawyers would traditionally stay at the Woodwards' house
on the Cape for an annual Fourth of July weekend gathering. The
two families also shared other times, including family celebrations
and tragedies. Mrs. Woodward testified that the Sawyers were one
of three couples with whom the Woodwards were the closest.
 The jury convicted Woodward of four (of the twenty-
eight) charges against him: one count each of mail and wire fraud,
one count of interstate travel to commit bribery, and one count of
conspiracy to commit the foregoing three offenses.
 II
 Requisite Intent Under Mail and Wire Fraud Statutes 
 To support a conviction for mail or wire fraud, the
government must prove beyond a reasonable doubt: "(1) the
defendant's knowing and willing participation in a scheme or
artifice to defraud with the specific intent to defraud, and
(2) the use of the mails or interstate wire communications in
furtherance of the scheme." Sawyer, 85 F.3d at 723; see 18 U.S.C.
 1341, 1343. "[T]he term 'scheme or artifice to defraud'
includes a scheme or artifice to deprive another of the intangible
right of honest services." 18 U.S.C. 1346; see Sawyer, 85 F.3d
at 723-24.
 The government charged that Woodward engaged in a scheme
to deprive the Commonwealth of Massachusetts and its citizens
(collectively, "the public" or "citizenry") of their right to his
honest services as a state legislator, performed free from deceit,
fraud, dishonesty, conflict of interest, and self-enrichment. In
addition to this general duty of honest services, the government
charged that Woodward had a specific duty to abide by Massachusetts
reporting requirements. With regard to the scheme to defraud, the
government charged, inter alia, that Woodward accepted, from
individuals (including Sawyer) representing Hancock and LIAM, golf,
meals, tickets, and other entertainment and benefits, in violation
of Massachusetts law; that Woodward filed false Statements of
Financial Interest ("SFI") under oath, in which he unlawfully
failed to report to the State Ethics Commission his receipt of the
gratuities; that Sawyer on behalf of Hancock and LIAM was given
greater access to the Insurance Committee and to Woodward as House
Chair than was available generally to the citizenry; and that, from
1984 through 1990, Woodward repeatedly performed official acts on
behalf of Hancock and LIAM. The government further charged that
Woodward used the mails and interstate telephone wires in
furtherance of the scheme, in violation of 18 U.S.C. 1341 and
1343.
 In Sawyer, we discussed mail and wire fraud in connection
with theft of honest services in a closely analogous situation
where the same facts formed the backdrop for the case. We
particularly highlighted the intent required to support a
conviction; intent is also a major issue in the present case. But
as Woodward stresses, his situation as the legislator is not
exactly identical to that of Sawyer as the lobbyist. We will,
therefore, summarize our analysis in Sawyer, insofar as is
applicable here.
 We explained that, prior to Sawyer, honest services fraud
had typically been found in two types of circumstances: 
(1) bribery, where a legislator was paid for a particular decision
or action, or (2) failure to disclose a conflict of interest,
resulting in personal gain. 85 F.3d at 724. As to the latter, we
noted that "[a] public official has an affirmative duty to disclose
material information to the public employer. When an official
fails to disclose a personal interest in a matter over which she
has decision-making power, the public is deprived of its right
either to disinterested decision making itself or, as the case may
be, to full disclosure as to the official's potential motivation." 
Id. (citing United States v. Silvano, 812 F.2d 754, 759 (1st Cir.
1987)). "Thus, undisclosed, biased decision making for personal
gain, whether or not tangible loss to the public is shown,
constitutes a deprivation of honest services." Id. The Sawyercase expanded category (1) from quid pro quo bribery, to include a
more generalized pattern of gratuities to coax "ongoing favorable
official action." Id. at 730; see infra.
 "The broad scope of the mail fraud statute, however, does
not encompass every instance of official misconduct," even of
"reprehensible misconduct," "that results in the official's
personal gain." Sawyer, 85 F.3d at 725. The government must prove
that the defendant intended to deprive the public of its right to
the honest services of its legislators. Id. at 725, 730. 
 This intent could be shown in a number of
 ways. For example, a bribery-like, corrupt
 intent to influence official action
 necessarily is an intent to deprive the public
 of an official's honest services. A person
 might not, however, give an unlawful gratuity
 with the intent to effect a specific quid pro
 quo. Rather, as the government contends here,
 a person with continuing and long-term
 interests before an official might engage in a
 pattern of repeated, intentional gratuity
 offenses in order to coax ongoing favorable
 official action in derogation of the public's
 right to impartial official services.

Sawyer, 85 F.3d at 730 (noting that "[s]uch conduct would be akin
to (although not a classic case of) the conflict of interest cases
noted" previously).
 Applying this principle to the facts adduced, we stated
that, "while Sawyer may not have provided the legislators with
direct kickbacks or commissions arising out of the specific
official action, he may have intended the legislators generally to
treat preferentially Hancock's interests, knowing that the free
meals, entertainment, and golf would continue so long as favorable
official acts were, at some point, taken." Id. We reversed the
mail and wire fraud convictions, nevertheless, because we could not
be sure that the jury convicted Sawyer based upon the Massachusetts
gift statute (as a basis for the federal scheme to defraud) or the
Massachusetts gratuity statute, and the former had been improperly
charged in the court's instructions to the jury. We mandated a
protective instruction to be used in cases such as this, which
would help the jury understand the difference between
"reprehensible misconduct" which is not a violation of federal law,
and misconduct which does form the basis for a federal conviction. 
Id. at 741. Noting that prior cases usually involved "quid pro quo
bribery or blatant conflict of interest," which was clearly
illegal, we distinguished Sawyer's gratuities to Woodward (and
other legislators) as involving conduct which "itself may not be
very different, except in degree, from routine cultivation of
friendship in a lobbying context," which does not violate federal
criminal law. Id. We noted that "[t]he practice of using
hospitality, including lavish hospitality, to cultivate business or
political relationships is longstanding and pervasive." Id. 
Because the "difference between lawful and unlawful turns primarily
on intent," we held that the court must instruct the jury that a
lobbyist does not commit honest services fraud or violate the
Travel Act if his "intent was limited to the cultivation of
business or political friendship." Id. He commits those
violations "only if instead or in addition, there is an intent to
cause the recipient to alter her official acts." Id.
 III
 Sufficiency of the Evidence
 Woodward's principal argument on appeal is that there was
insufficient evidence for the jury to find beyond a reasonable
doubt that he had the requisite intent on any of the four counts at
issue here. We will focus our discussion here on the mail and wire
fraud counts. We held in Sawyer that the intent required for a
Travel Act violation is the same as that for mail and wire fraud. 
85 F.3d at 741. Woodward argues that the conspiracy count must
fall because there is insufficient evidence to support the
substantive counts that served as its objects. 
 Because theft of honest services constitutes a "scheme or
artifice to defraud" within the meaning of the mail and wire fraud
statutes, see Sawyer, 85 F.3d at 723-24, the question becomes
whether the jury could reasonably have found that Woodward intended
to steal his honest services from the public. As Woodward phrased
it in his brief, "[t]he central question is whether by accepting
his friend's largesse Woodward intended to be influenced to support
Hancock's legislative interests."
 A
 Standard of Review
 In determining the evidentiary sufficiency of a guilty
verdict, "the relevant question is whether, after viewing the
evidence in the light most favorable to the prosecution, anyrational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt." Jackson v. Virginia, 443
U.S. 307, 319 (1979). "The scope of review is over the totality of
the evidence, both direct and circumstantial." United States v.
Czubinski, 106 F.3d 1069, 1073 (1st Cir. 1997).
 Woodward focuses most of his sufficiency challenge on an
alleged lack of intent to be influenced. He argues that the
evidence was insufficient to show that Woodward accepted Sawyer's
gratuities with the intent to deprive the public of his honest
services by performing official acts on behalf of Hancock (or the
life insurance industry). 
 Woodward "bear[s] a heavy burden" in arguing
insufficiency of the evidence, even with respect to this intent
element. United States v. Biaggi, 853 F.2d 89, 99 (2d Cir. 1988). 
"An appellate court plays a very circumscribed role in gauging the
sufficiency of the evidentiary foundation upon which a criminal
conviction rests. The court of appeals neither weighs the
credibility of the witnesses nor attempts to assess whether the
prosecution succeeded in eliminating every possible theory
consistent with the defendant's innocence." United States v. Noah,
130 F.3d 490, 494 (1st Cir. 1997). We "defer, within reason, to
inferences formulated by the jury in the light of its collective
understanding of human behavior in the circumstances revealed by
the evidence." United States v. Guerrero 114 F.3d 332, 339 (1st
Cir.) (internal quotation marks omitted), cert. denied sub nom.
Pilco v. United States, 118 S. Ct. 184 (1997).
 In reviewing Woodward's contention, "we must view the
evidence in the light most favorable to the government, crediting
every inference that could have been drawn in the government's
favor, and we must affirm the convictions so long as, from the
inferences reasonably drawn, the jury might fairly have found the
requisite connection beyond a reasonable doubt." Biaggi, 853 F.2d
at 99 (citations omitted); see Sawyer, 85 F.3d at 731.
 As we stated in Sawyer (in the context of intent to
deceive):
 The evidence need not compel an intent-to-
 deceive finding; rather, it is only required
 that a reasonable jury could be persuaded,
 beyond a reasonable doubt, that [Woodward] had
 such intent. And we are mindful that a jury
 may choose among the reasonable alternatives
 posed by the evidence. Finally, the specific
 intent to deceive may be proven (and usually
 is) by indirect and circumstantial evidence.

Sawyer, 85 F.3d at 733 (citations omitted). 
 "Despite the deference that characterizes appellate
review of jury verdicts, juries do not have carte blanche. The
appellate function . . . requires the reviewing court to take a
hard look at the record and to reject those evidentiary
interpretations and illations that are unreasonable, insupportable,
or overly speculative. This function is especially important in
criminal cases, given the prosecution's obligation to prove every
element of an offense beyond a reasonable doubt." United States v.
Spinney, 65 F.3d 231, 234 (1st Cir. 1995) (citations omitted). 
"[A]n appellate court must reverse a conviction on the grounds of
evidentiary insufficiency 'where an equal or nearly equal theory of
guilt[] and a theory of innocence is supported by the evidence
viewed in the light most favorable to the verdict.'" Guerrero 114
F. 3d at 344 (quoting United States v. Andujar, 49 F.3d 16, 20 (1st
Cir. 1995)). In such cases, "a reasonable jury must necessarily
entertain a reasonable doubt." Andujar, 49 F.3d at 20. Viewed in
this context, we find that the government has met its burden of
proof beyond a reasonable doubt.
 B
 Intent (Counts 1, 4, 9, 14)
 In Sawyer, we noted two of the ways that a public
official can steal his honest services from his public employer: 
(1) the official can be influenced or otherwise improperly affected
in the performance of his duties, 85 F.3d at 724, 729; or (2) the
official can fail to disclose a conflict of interest, resulting in
personal gain, id. at 724. The government asserts that the
evidence supports the jury's finding that Woodward had the
requisite intent to deprive the public of his honest services in
both of these ways. We agree.
 1. Influence in Official Action
 As Woodward states in his brief, "the government must
[have] demonstrate[d] that there was sufficient evidence for a
rational jury to conclude that Woodward accepted the free meals and
entertainment from Sawyer with the intent to perform official acts
to favor Hancock's legislative interests." Def. Br. at 19. 
Identical standards apply in determining the "scheme to defraud"
element under the mail and wire fraud statutes. Czubinski, 106
F.3d at 1076 n.10.
 "The jury was entitled to infer [the defendant's] intent
from the circumstances surrounding" his actions, from indirect, as
opposed to direct, evidence. United States v. Fulmer, 108 F.3d
1486, 1493 (1st Cir. 1997); see United States v. Taylor, 54 F.3d
967, 975 (1st Cir. 1995) (noting that a showing of criminal intent
"may be made wholly on the basis of circumstantial evidence"). Nor
are juries "required to examine the evidence in isolation";
"'individual pieces of evidence, insufficient in themselves to
prove a point, may in cumulation prove it. The sum of an
evidentiary presentation may well be greater than its constituent
parts.'" United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992)
(quoting Bourjaily v. United States, 483 U.S. 171, 179-80 (1987));
see also United States v. Montminy, 936 F.2d 626, 627-28 (1st Cir.
1991).
 In Sawyer, we reviewed much of the same evidence that was
presented to the jury here, and determined that the evidence was
sufficient "to prove [Sawyer's] intent to influence the
legislators' official acts." 85 F.3d at 731. We noted that Sawyer
continually gave gifts for the purposes of gaining access and
developing a relationship with Woodward and other legislators. 
From this, the jury could have inferred that Sawyer intended to
induce official actions favorable to Hancock's interests. Id.; see
also id. at 739 (noting that Sawyer gave items of substantial value
to legislators like Woodward who had the ability to take official
action favorable to Hancock, that those gifts ceased after the
legislators left office, and that Sawyer had long-term ongoing
interests in official actions and knew the gratuities were illegal;
and concluding that the jury could rationally have inferred that
"the gratuities were motivated by the legislators' performance of
official duties, i.e., that they were given 'for or because of any
official act,' within the meaning of the Massachusetts gratuity
statute, Mass. Gen. L. ch. 268A, 3.").
 The same inferences regarding Woodward's intent can be
drawn from the evidence here, based upon the nature and sequences
of events, certain explicit statements, and the suggestions of a
cover-up. In Sawyer, of course, the jury was assessing the
motivation of the donor of the gratuity, Sawyer, not that of the
donee, Woodward. But it is an equally valid inference, from the
foregoing evidence coupled with the fact that Sawyer and Woodward
spent a good amount of time together, that Woodward understood the
gratuities and their purpose in the same way that his "close
friend" Sawyer did. Woodward knew that Sawyer was giving him items
of substantial value, continuing over a long period of time; he
knew that Sawyer had a long-term ongoing interest in his official
acts; and that he had the ability to take official action favorable
to Hancock. Woodward also knew that his relationship with Sawyer
began after he became a member of the Insurance Committee and that
the gifts increased substantially shortly after he became chair of
the committee that handled insurance legislation. Finally,
Woodward knew that, at many of the same entertainment events that
he enjoyed, Sawyer also wined and dined other legislators in a
similar manner, and those legislators had only a business
relationship, not a friendship, with Sawyer. In light of all this,
the jury could have inferred that Woodward knew what the deal was 
 that the gratuities would continue as long as he voted favorably
to Hancock's interests, see Sawyer, 85 F.3d at 730 and that he
intended to be influenced by the gratuities.
 Moreover, the jury had additional evidentiary bases for
drawing the inference that Woodward's intent included an illegal
element rather than being solely based on friendship. After
entertaining Woodward for several days at the Scottsdale COIL
conference in 1991, Sawyer left the conference early, but left his
credit card to be used for paying Woodward's golf and meal expenses
during the remainder of the conference. This is not consistent
with mere friendship as the sole purpose of the payments, but
rather is more consistent with the theory of a gratuity made
because of Woodward's potential official actions.
 In addition, Woodward received some gratuities from
Sawyer (although in lesser amounts) at events where other
legislators mostly members of the Insurance Committee, who could
also influence legislative acts in favor of Hancock were also
present. This too indicates an illegal gratuity more than the
camaraderie of "close friends." Similarly, some of Woodward's
gratuities came from LIAM, through its president, Carroll, who was
not a personal friend of Woodward's.
 The same inference can be drawn from the fact that the
expenditures were not mutual but rather operated in one direction
only. The standard operating procedure was for Sawyer to pay for
meals, drinks and golf for Woodward; Woodward did not make similar
payments for Sawyer. If the reason Sawyer "picked up the tab" for
Woodward on some occasions was simply because the two men were
"close friends," one would expect there to be a roughly equal
number of occasions on which Woodward "picked up the tab" for
Sawyer. But that was not the case.
 Indeed, the only evidence in the record as to Woodward
performing some reciprocal acts of treating his "close friend"
Sawyer were the weekends spent on Cape Cod. On those occasions,
Woodward invited the Sawyers to stay at the Woodward family's house
on the Cape, where the Woodwards cooked some meals. In return,
according to Woodward, Sawyer would pay for a group dinner at a
nearby restaurant.
 Significantly, the jury returned not guilty verdicts on
all indictments alleging such reciprocal expenditures. In
contrast, the jury weighed the evidence differently as to four
counts charging Woodward with accepting gratuities in a non-mutual,
non-reciprocal way. As to these, the jury apparently viewed
Sawyer's expenditures and Woodward's acceptance of them as notbeing based on the two men's friendship but rather based on a
business relationship: i.e., insurance industry lobbyist and Chair
of the Legislature's Insurance Committee. The jury recognized 
and this recognition is supported by the evidence of record that
the two men had two types of relationships, a personal friendship
and a business relationship. Woodward's acceptance of expenditures
that were part of their friendship was not illegal, but his
acceptance of expenditures in the context of their business
relationship constituted theft of the honest services that Woodward
owed to his constituents. We think the evidence was sufficient for
a reasonable juror to so conclude beyond a reasonable doubt. The
jury was free to "choose among the reasonable alternatives posed by
the evidence," Sawyer, 85 F.3d at 733, and we will not second-guess
the jury's conclusion in this regard. 
 Another reason the jury could have rejected Woodward's
contention that Sawyer picked up his tab solely because of
friendship rather than as an attempt to influence is the direct
statements showing how Woodward expected to receive gratuities from
Sawyer (and, through him, from Hancock). In 1989, at a COIL
conference in Florida, Lorraine Bohannon, the former staff director
of the Insurance Committee, who reported directly to Woodward, went
out to dinner with Woodward, Sawyer, and their spouses. There is
no evidence that Bohannon had any kind of personal friendship with
Sawyer. After dinner, Bohannon offered to Woodward to pay a
portion of the bill, and Woodward's response was: "Don't worry
about it; it's taken care of." Sawyer picked up the tab and was
reimbursed by Hancock for the bill.
 The government presented evidence of another direct
statement to demonstrate Woodward's illegal intent. After Woodward
left the legislature, he expressed interest in working for Hancock
as a lobbyist. He asked Sawyer to help him obtain the job. Sawyer
told Woodward he was not qualified for the job, and Woodward was
"very hurt." Subsequently when he talked to Committee research
director Robert Smith about the Hancock job, Woodward said, in
effect, "After all I did for Bill Sawyer, you know, I can't believe
he's not he can't get me a job" or "he's not getting me a job." 
The prosecutor asked Smith whether Woodward told him what "he felt
he had done for Bill Sawyer," and Smith replied, "Not specifically,
just generally. 'After all these years as Chairman of the
committee and trying to do the right thing and being willing to
take on tough issues, I would I expected, you know, more
assistance than I received.'" 
 Woodward argues that this conversation does not
demonstrate any illegal intent on Woodward's part. He points out
that, at trial, Smith could not recall Woodward saying "after all
I've done for Sawyer," but only "after all I've done." Woodward
also notes that "trying to do the right thing" could have meant
following his own conscience, not necessarily doing the "right
thing" for Sawyer and Hancock. Similarly, "taking on tough issues"
did not necessarily mean "taking on tough issues" for Sawyer or
Hancock. At trial, Smith testified that he did not interpret these
phrases in an illegal manner.
 But Woodward's argument is belied by the totality of
Smith's testimony about the conversation, or at least a reasonable
jury could have so inferred. In his grand jury testimony, which
was used by the government at trial, Smith testified to the more
directly inculpatory language: "after all I did for Bill Sawyer." 
And Smith's trial testimony covered additional incriminating
evidence that Smith had revealed to the grand jury but did not
include in his direct testimony at trial. When asked (at the grand
jury session) to repeat the whole conversation, Smith testified:
 [Woodward] said that he had spoken to Bill
 Sawyer and that Bill Sawyer had been reluctant
 to help him, and Representative Woodward at
 that time -- as many legislators do, they
 don't remember the specific bill numbers or
 subject matter, but they'll remember in
 general if they were favorable towards someone
 or not -- said to me "you would think after
 all the years and everything I've done I would
 be treated better than I have been treated."

This juxtaposition of the "everything I've done" language with the
notion of legislators "remember[ing] in general if they were
favorable towards someone or not" carries a strong implication
that, at least in Smith's mind as he heard Woodward make the quoted
statements, Woodward's reference to "all he had done" was meant in
the sense of taking action in the legislature to favor Sawyer and
Hancock's interests. 
 Smith's grand jury testimony, elicited after an
inconsistent statement at the trial, constitutes substantive
evidence under Fed. R. Evid. 801(d)(1)(A). The jury, in assessing
Smith's credibility in the context of all his testimony, could well
have believed that Smith's grand jury testimony with its
incriminating inferences was true; and the jury could have
concluded that Smith's trial testimony was not believable to the
extent it undercut the grand jury testimony. On appeal, of course,
we view the evidence in the light most favorable to the verdict,
not the light most favorable to Woodward. Credibility assessments
are properly left to the jury. United States v. Mangual-Corchado,
139 F.3d 34, 43 n.20 (1st Cir. 1998). And juries are not required
to evaluate the evidence in isolation; "individual pieces of
evidence, insufficient in themselves to prove a point, may in
cumulation prove it." Bourjaily, 483 U.S. at 179-80.
 The inference of illegal intent grows even stronger when
we consider another aspect of what Woodward told Smith about his
attempt to persuade Sawyer to help him get a job at Hancock. 
According to Smith's trial testimony, Woodward said: "If he
[Woodward] could not get the job himself he'd like to see his son
Brian get the job." Smith testified that he was unaware of any
experience that Woodward's son, Brian, had in insurance matters. 
This, too, carries the implication that Woodward was expecting some
kind of reward from Sawyer/Hancock for all his years of favoring
the industry's position in the legislature.
 In addition, as Woodward recognizes, "[i]ntent can be
inferred from a defendant's conduct, viewed in light of all the
surrounding circumstances." Def. Br. at 19; see, e.g., Gaunt v.
United States, 184 F.2d 284, 290-91 (1st Cir. 1950). Thus "[t]he
best evidence of Woodward's intent to perform official acts to
favor Hancock's (and LIAM's) interests is the evidence of
Woodward's actions on bills which were important to Hancock." Id. 
Unfortunately for Woodward, the evidence supports the jury's
verdict, rather than undermining it as he contends.
 It is not necessary for the government to link a
particular gratuity with a specific act in order to obtain a
conviction. Sawyer, 85 F.3d at 738-39; see discussion supra at
p. 13. Nevertheless, Woodward disputes the extent to which, in his
official capacity as chair of the Insurance Committee, he took
action that served the interests of his benefactors. The evidence
does not support his contention. According to Robert Smith,
Woodward was the most pro-life-insurance-industry chair of the
Committee, of the seven House and Senate chairs with whom Smith
worked during the ten years that Smith served as the Committee's
research director. Woodward even took pro-industry positions in
opposition to his own committee. As an example, in each year from
1985 through 1990, the legislature considered a bill proposing
mandatory discounts on life insurance for non-smokers. Hancock and
LIAM opposed the bill. In 1989, the bill received favorable
recommendation from the Insurance Committee based on support from
Senator Linda Melconian, Woodward's co-chair of the Committee. But
despite the Committee's favorable report, Woodward led the
opposition to the bill in debate before the full House of
Representatives, and was successful in defeating the so-called
"non-smoker's bill" for that session. Hancock's vice-president,
who directly supervised Sawyer, called the bill's defeat a
"significant victory for the industry."
 Woodward also led the Insurance Committee to support and
report favorably bills proposed by the industry. Among these were
bills allowing life insurance companies to change the ways in which
they valued real estate assets, to adjust pension funds, to provide
financial services, and to be flexible in corporate governance and
finance.
 In addition, more than any other co-chair from 1985-95,
Woodward "carried" bills sought by the life insurance industry. 
This means that, after the bill left the committee, Woodward served
as the point person to push these bills through the legislative
process.
 Woodward challenges this characterization of the meaning
of "carrying" a bill after it leaves committee. Woodward contends
that "carrying" is merely a ministerial function, that it simply
refers to the fact that the chair of any committee of the
Massachusetts legislature "sign[s] the paperwork recommending a
bill favorably and [is] available to answer questions from non-
committee legislators when [the bill is] presented to the House or
Senate floor." Woodward relies on Robert Smith's testimony for the
proposition that carrying legislation does not necessarily mean
advocating or leading the debate for the bill on the House floor,
that that role is normally reserved for the legislator who sponsors
the bill. 
 Smith's testimony to this effect, however, was impeached
with his grand jury testimony in which he had testified that
"carrying" meant actively guiding bills through the legislative
process. As we noted in discussing the conversations about getting
Woodward a job at Hancock, the jury was entitled to believe this
portion of Smith's testimony (i.e., introduction at trial of his
prior grand jury testimony) that "carrying" means actively
guiding a bill through the process; it is not merely ministerial 
and the jury was entitled to disbelieve other parts of his trial
testimony that supported Woodward's interpretation to the contrary. 
 Woodward points to thirty-one (31) bills that he
supported despite opposition on the part of Hancock and the
insurance industry. But, as the government notes, the proper
analysis is to examine all bills considered by the Committee in
context, not to isolate a relatively small number of bills in an
effort to show that Woodward was not 100% in the industry's pocket. 
The record reflects that, during his six years as co-chair of the
Insurance Committee, there were approximately one hundred bills per
year that were of interest to the life insurance industry, for a
total of six hundred bills during his tenure. Woodward opposed the
industry's position on only thirty-one of those bills. Moreover,
at least ten of the opposed bills were duplicates of previously
filed bills. Of the remainder, only three actually related to life
insurance. The rest concerned mandated benefits for health
insurance which were of less importance to the life insurance
industry, in particular to Hancock. This is because, as Hancock's
attorney testified, life insurance was Hancock's "big money earner
in terms of profit." The company's group health insurance business
was "[o]ne of the lesser profit earners." As already noted,
several of the bills where Woodward's position conformed to the
life insurance industry's positions were of great importance to the
industry in that the bills significantly improved the industry's
profitability.
 Woodward relies heavily on Czubinski, 106 F.3d at 1076,
where we cited Sawyer for the "most important[]" proposition that
the government must do more than "merely indicate wrongdoing by a
public official, but must also demonstrate that the wrongdoing at
issue [was] intended to prevent or call into question the proper or
impartial performance of that public servant's official duties." 
Czubinski, 106 F.3d at 1076 (citing Sawyer, 85 F.3d at 725). In
Czubinski, we explained that Czubinski's "case falls outside of the
core of honest services fraud precedents," in that he was "not
bribed or otherwise influenced in any public decisionmaking
capacity." Id. at 1077. We also distinguished Czubinski's
"relatively straightforward" job responding to information
requests from the public from "a discretionary, decision-making
role," which "raise[s] the specter of secretive, self-interested
action.". Id. We found "no evidence that Congress intended to
create what amounts to a draconian personnel regulation," by
"transforming governmental workplace violations into [federal]
felonies." Id. 
 The instant case is very different from Czubinski. As
Woodward recognizes, Czubinski did not receive or intend to receive
any tangible benefit from his conduct, whereas Woodward did. 
Additionally, Czubinski's official duties did not involve the
discretionary, decision-making role of a legislator. 
"Notwithstanding these factual differences," Woodward asserts,
"Czubinski and the instant case are similarly flawed by the failure
of proof on the critical fraudulent intent element." We disagree. 
As discussed supra, the jury in the present case could justifiably
have inferred the fraudulent intent element. Woodward did receive
tangible benefits here, as Czubinski had not. And the connection
between the gratuities and Woodward's official acts could have been
justifiably inferred from the fact that Woodward had discretion to
act or not act in ways that would further the insurance industry's
interests; this discretion extended both to the bottom line
(support of or opposition to the industry's position on
legislation) and to the degree of vigor with which Woodward
championed the industry's positions.
 2. Failure to Disclose Conflicts of Interest
 In addition to demonstrating Woodward's intent by
evidence showing that he was influenced or otherwise improperly
affected in performing his duties, the government argues that
Woodward's intent is also demonstrated by his failure to disclose
his conflict of interest although he was required to do so. We
agree. 
 Massachusetts law mandates such disclosure on his
Statements of Financial Interest (SFIs). Mass. Gen. Laws ch. 268B,
 5 (West 1990). In addition, separate and apart from the state
statute, "[t]he obligation to disclose material information inheres
in the legislator's general fiduciary duty to the public." Sawyer,
85 F.3d at 733 n.17. We recognized in Sawyer that the non-
disclosure of a conflict of interest is a second way in which a
public official can steal his honest services. 85 F.3d at 724; cf.id. at 728 ("[U]nlike the honest services fraud cases, noted above,
in which an official was bribed or took official action based on a
secret conflict of interest, a gift statute violation, even if
intentional, does not itself amount to honest services fraud." 
(Emphasis added)). The evidence of Woodward's non-disclosure is
also probative of Woodward's intent; it supports the jury's finding
that he had the requisite intent.
 As we stated in Sawyer:
 A public official has an affirmative duty to
 disclose material information to the public
 employer. When an official fails to disclose
 a personal interest in a matter over which she
 has decision-making power, the public is
 deprived of its right either to disinterested
 decision making itself or, as the case may be,
 to full disclosure as to the official's
 potential motivation behind an official act.

Sawyer, 85 F.3d at 724 (citing Silvano, 812 F.2d at 759).
 In addition to the general "affirmative duty to disclose"
discussed in Sawyer, Woodward had a specific statutory duty each
year to file a Statement of Financial Interests with the
Massachusetts State Ethics Commission. See Mass. Gen. Laws
ch. 268B, 5. Woodward was required to disclose on his SFI forms
all gifts he or his immediate family received, aggregating more
than $100 per year, from lobbyists or businesses that had a direct
interest in legislation. He had to sign the forms under oath. 
Woodward did not report the gratuities he received from Hancock or
LIAM on any of his SFI forms submitted for the years 1984 through
1992.
 Woodward contends that his failure to comply with the
Massachusetts reporting statute, while "reprehensible," is not
relevant here. We disagree. In Czubinski, we listed "the failure
of public decision-makers to disclose certain conflicts of
interest" as one of three examples of "serious corruption" on the
part of public officials that would "typically" justify an honest
services conviction. 106 F.3d at 1076. Woodward's failure to
report supports the implication that Woodward was aware that these
gratuities were improper, especially in light of the fact that
"[m]uch of his entertainment . . . took place out-of-state --
usually at industry and legislative conferences -- where members of
the Massachusetts citizenry generally would not observe the
questionable activities." Sawyer, 85 F.3d at 733. Woodward had
every incentive to keep these "questionable activities" secret from
the public by not disclosing them on his SFIs. The SFIs are public
documents, which are frequently scrutinized by the press and
political opponents during election years. In fact, the only gift
Woodward ever reported was a local, public golf tournament
sponsored by Massachusetts Candy & Tobacco Distributors, Inc.,
which he reported after learning that the tournament was under
investigation by the State Ethics Commission. 
 We agree with the government that Woodward's intentional
failure to disclose the Hancock and LIAM gifts in itself provides
a solid basis for the jury to find that Woodward had the requisite
intent to deprive the public of his honest services. This same
evidence also supports the finding that Woodward had the intent to
deceive necessary for a mail and wire fraud conviction. See supraat 13, n.6. "[A]n official's intentional violation of the duty to
disclose provides the requisite 'deceit.'" Sawyer, 85 F.3d at 732
(quoting Silvano, 812 F.2d at 760).
 Viewing the record in the light most favorable to the
verdict, a rational jury could have found the requisite intent from
the trial evidence. The evidence was sufficient for a rational
juror to find, beyond a reasonable doubt, that Woodward accepted
gratuities from Sawyer with the intent to defraud the public of its
right to his honest services, and that he had the specific intent
to deceive. See also Sawyer, 85 F.3d at 742 (finding that the
evidence adduced there "would be adequate to infer improper
intent").
 C
 Other Elements of Wire Fraud (Count 9)
 As noted supra, to support a conviction for mail or wire
fraud, the government must prove beyond a reasonable doubt: 
"(1) the defendant's knowing and willing participation in a scheme
or artifice to defraud with the specific intent to defraud, and
(2) the use of the mails or interstate wire communications in
furtherance of the scheme." Sawyer, 85 F.3d at 723; see 18 U.S.C.
 1341, 1343. 
 Woodward also challenges his convictions based on the
second requirement. He argues that the government offered
insufficient evidence to prove either that Woodward caused the
wiring or that the wiring was "for the purpose of executing [the]
scheme" to defraud. See 18 U.S.C. 1343.
 The wire fraud count relates to a COIL conference in
Orlando, Florida, in November, 1990. The indictment alleged that
on November 21, 1990, a call was placed from Boston, Massachusetts,
to Lake Buena Vista, Florida, and that its purpose involved
"[a]rrangements related to entertainment in Florida." 
 Woodward claims that he did not "cause" this telephone
call to be made, and that it was not made for the purpose of
executing a scheme for Woodward to defraud the public of its right
to his honest services. We disagree on both points. As we stated
in Sawyer, Woodward "'need not personally use the wires as long as
such use was a reasonably foreseeable part of the scheme in which
[he] participated.'" 85 F.3d at 723 n.6 (quoting United States v.
Boots, 80 F.3d 580, 585 n.8 (1st Cir.), cert. denied, 117 S. Ct.
263 (1996)). In addition, "[t]he use of the mails or wires to
further the fraudulent scheme need only be 'incidental.'" Id.(quoting United States v. Grandmaison, 77 F.3d 555, 566 (1st Cir.
1996)). 
 Here, Woodward concedes that the jury could reasonably
have inferred from the evidence that Hancock's Functions
Coordinator called the Florida hotel on or about November 21, 1990,
for the purpose of reserving a room, so Sawyer could attend the
COIL conference in Orlando. Nevertheless, Woodward claims that he
could not have reasonably foreseen that a Hancock employee would
make a room reservation for Sawyer at this COIL conference, nor
that she would use the telephone to do so. According to Woodward,
Sawyer's "presence [at the conference] could have been ensured by
many means other than the fortuity of an interstate telephone call
to reserve his hotel room." We disagree.
 Woodward knew full well that Sawyer would need a hotel
room in Florida for the COIL conference, and that Sawyer's office
was located in Massachusetts. Woodward could reasonably have
foreseen that the hotel reservations in Florida would be made by
phone either by Sawyer or by someone acting on his behalf. That
Sawyer could conceivably have made his room reservation in person
or by mail does not undermine the foreseeability of a telephone
call. The jury was entitled to use its common sense to infer that
a reasonable person would have foreseen a telephonic reservation,
as a means commonly employed in the business world for transactions
of this type. Thus, the jury was entitled to conclude, based on
the evidence presented, that Woodward "caused" the wiring.
 Woodward further argues that "the evidence presented was
insufficient to show that the purpose of this call was to execute
a scheme by Woodward to deprive the public of its right to his
honest services by receiving gratuities from Sawyer with the intent
to favor unlawfully Hancock's legislative interests." Def. Br. at
27. We disagree. The jury could reasonably have concluded that
the call was made in furtherance of the scheme to defraud. Sawyer
would not have been able to give Woodward the illegal gratuities
during the COIL conference if Sawyer did not have a hotel room in
which to stay for the four days of the conference. The call in
question secured that room, and thus played an essential role in
the scheme.
 Our conclusion is buttressed by decisions involving mail
fraud, which is analogous to wire fraud for these purposes. The
focus of our inquiry on this question "ought to be concerned less
with the precise contents of the particular mailings than with the
role those mailings played in the execution of the scheme to
defraud." United States v. Serino, 835 F.2d 924, 928 (1st Cir.
1987). In Silvano, we upheld a mail fraud conviction of government
officials, where the defendants neither placed nor received any of
the mailings. (The mailings consisted of the payment of premiums
and commissions, all incidental to, but related to, commission of
the fraud.) We held that these mailings were sufficiently in
furtherance of the fraud. 812 F.2d at 760. We reasoned that "the
federal mail fraud statute sweeps broadly and its prohibitions
extend to the use of the mails by corrupt local government
officials. It is similarly settled that use of the mails need be
no more central to the illegal scheme than were the mailings
supporting the counts upon which [the defendants] were convicted." 
Id.
 The evidence was sufficient to support Woodward's wire
fraud conviction.
 D
 Mail Fraud (Count 4)
 With respect to the mail fraud count, Woodward concedes
that, "because the evidence showed he was at events for which
Sawyer paid with his credit card, it was reasonably foreseeable to
him that Sawyer would be billed by mail for these credit card
expenditures on his behalf." Def. Br. at 28. Therefore he does
not contest the fact that he "may be said to have 'caused' the
mailing alleged in Count 4 when he let Sawyer pick up the tab." 
Id.
 But he contends that "the purpose of the mailing strays
far from the execution of a scheme by Woodward to defraud the
public." Id. at 29. He argues that the scheme had already reached
fruition by the time the mails were used. He points to United
States v. Maze, 414 U.S. 395 (1974), where the Supreme Court noted
that "Congress could have drafted the mail fraud statute so as to
require only that the mails be in fact used as a result of the
fraudulent scheme. But it did not do this; instead, it required
that the use of the mail be 'for the purpose of executing such
scheme or artifice.'" Id. at 405 (footnote omitted) (emphasis
added). 
 In the present case, the mailing in question was sent by
Citibank Visa to Sawyer, billing him for charges arising from
Sawyer's use of his Visa card to pay for illegal gratuities given
to Woodward. According to Woodward, because the mailing took place
some three to four weeks after Sawyer purchased the meals and
entertainment for Woodward, the use of the mail was "a result of"
the fraudulent scheme but not "for the purpose of executing" the
scheme. Id. We disagree.
 Woodward's argument focuses too narrowly, on each
gratuity individually. His contention assumes a new fraudulent
scheme began and ended every time Sawyer used his credit card to
pick up the tab for Woodward. On the contrary, the evidence
supported the conclusion that the fraudulent scheme in which
Woodward and Sawyer participated was an ongoing scheme, lasting for
years and involving Sawyer's use of his credit card. Every month,
Visa would use the mails to bill Sawyer for his charges; if Sawyer
did not pay those bills, his credit line would have been terminated
and the gratuities could not have continued as Woodward and Sawyer
expected. It was thus a necessary part of the ongoing scheme that
Sawyer pay his bill after receiving it in the mail. See Sawyer, 85
F.3d at 730 ("[A] person with continuing and long-term interests
before an official might engage in a pattern of repeated,
intentional gratuity offenses in order to coax ongoing favorable
official action in derogation of the public's right to impartial
official services.") This case is therefore distinguishable from
Maze, where the mailing involved only a post-fraud accounting among
victims, after the defendant's fraudulent use of credit cards was
already completed. See Maze, 414 U.S. at 402; Schmuck v. United
States, 489 U.S. 705, 714 (1989) (distinguishing and limiting Mazeto cases in which the fraudulent scheme has come to fruition).
 Woodward cursorily argues that the wiring and mailing are
merely "a pretext to manufacture federal jurisdiction over a local
offense." Def. Br. at 30 (mail fraud); see id. at 28 (wire fraud). 
We have already rejected such a federalism claim: "Congress may
protect the integrity of the interstate mails and wires by
forbidding their use in furtherance of schemes to defraud a state
and its citizens, whether or not it can forbid the scheme itself." 
Sawyer, 85 F.3d at 722-23 (citations omitted).
 The evidence was sufficient to support the mail fraud
conviction.
 E
 Travel Act (Count 14)
 The elements of a Travel Act violation include: 
(1) interstate travel or the use of an interstate facility;
(2) with the intent to promote, manage, establish, carry on, or
facilitate an unlawful activity (here, violation of the
Massachusetts gratuity statute, Mass. Gen. Laws ch. 268A, 3 (West
1990); and (3) followed by performance or attempted performance of
acts in furtherance of the unlawful activity. See 18 U.S.C.
 1952; United States v. Arruda, 715 F.2d 671, 681 (1st Cir. 1983).
 Woodward argues that the evidence supporting the Travel
Act conviction was deficient in four respects. First, he argues
that the evidence was insufficient to establish the requisite
criminal intent to violate 18 U.S.C. 1952. We disagree, for the
same reasons discussed in Part III(B), supra, in relation to his
intent under the mail and wire fraud statutes. See Sawyer, 85 F.3d
at 741 (equating intent requirements of mail and wire fraud
statutes with that required under Travel Act).
 Second, Woodward maintains that, in order to prove a
violation of the Travel Act, the government had to prove that
Woodward violated the bribery laws of Florida. The Travel Act
punishes traveling in interstate commerce for the purpose of
carrying on any unlawful activity; such activity encompasses the
commission of bribery "in violation of the laws of the state in
which committed or of the United States." 18 U.S.C. 1952(b)(2). 
The indictment incorporates the Massachusetts gratuity statute,
Mass. Gen. Laws ch. 268A, 3, as the underlying bribery offense. 
Woodward contends that the bribery, if any, took place only in
Florida, and therefore, without evidence of any Florida bribery
statute, the Travel Act conviction must be reversed. This argument
is unavailing.
 The Travel Act "does not require the government to prove
that the alleged 'unlawful activity' violates the laws of the state
ultimately traveled to," or of the state where money actually
changed hands. United States v. Walsh, 700 F.2d 846, 854-55 (2d
Cir. 1983) (mayor of city in New Jersey agreed in New Jersey to
accept bribe and traveled to New York to collect it); see United
States v. Jones, 642 F.2d 909, 913 (5th Cir. 1981). A conviction
may be sustained where the evidence demonstrates "unlawful
activity" in violation of the laws of the state where the effects
of the fraudulent scheme are felt, in this case, the state whose
citizens are defrauded of their legislator's honest services. SeeWalsh, 700 F.2d at 854-55. Here, Woodward is a legislator from
Massachusetts, and the jury could have concluded that the gratuity,
though paid in Florida, was paid for the purpose of influencing
legislative activities in and affecting Massachusetts. As we
discuss below, that is sufficient.
 Woodward's third challenge to his Travel Act conviction
involves timing. He asserts that there was no evidence that
Woodward performed any acts in furtherance of the unlawful activity
after the interstate travel on November 24, 1990, as alleged in the
indictment. Woodward notes that, although the Travel Act requires
such, the Massachusetts gratuity statute does not require any
subsequent activity to be taken in Massachusetts after the Florida
bribe. As evidence of Woodward's post-gratuity activity, the
government points to Woodward's action with respect to S. 641,
which proposed premium reductions in life insurance for
policyholders who were non-smokers. The bill was originally
reported favorably out of the Insurance Committee on May 7, 1990. 
Then on July 24, 1990, just before becoming law, the House of
Representatives recommitted the bill to the Insurance Committee.
The effect of a bill's recommittal is that both chairs would have
to act in order for the bill to be released. The bill languished
in the Insurance Committee with no further action taken through
January 1, 1991, after Woodward received the Florida gratuities and
prior to his removal as co-chair. Woodward's co-chair, Senator
Melconian, had actively supported the 1989 bill by requesting a
favorable recommendation from the Insurance Committee. The jury
could, therefore, reasonably have inferred that Woodward prevented
any further action on S. 641, because in the previous year he led
the floor debate, on behalf of Hancock and LIAM, against a similar
non-smokers bill.
 Woodward's receipt of the gratuities in Florida and the
subsequent recommittal of S. 641 through January 1991 provided
sufficient evidence to allow the jury to find that Woodward
performed an act in furtherance of the unlawful activity after the
travel to Florida on November 24, 1990. Arruda, 715 F.2d at 682. 
Woodward's timing argument thus fails.
 Woodward's fourth argument against his Travel Act
conviction is that "the payment of the 'bribe' in Florida" has such
an "attenuated relationship to Massachusetts" that it would violate
the "effects doctrine." Def. Br. at 32. "Under this doctrine, a
sovereign only possesses jurisdiction to prosecute a crime where,
inter alia, 'the effect within the territory is substantial.'" 
Id. (quoting Commonwealth v. Beneficial Fin. Corp., 275 N.E.2d 33,
57 n.8 (1971)). Because acts that might otherwise be "gratuities"
could be performed out-of-state without any corresponding "effect"
in Massachusetts, Woodward maintains that Massachusetts would lack
jurisdiction to prosecute purely out-of-state expenditures. Def.
Br. at 32 (citing Heath v. Jones, 941 F.2d 1126, 1139 (11th Cir.
1991) (no due process violation when state prosecutes crime that
started within its borders and concluded in another state);
Commonwealth v. Levin, 417 N.E.2d 440, 451 (Mass. App. Ct. 1981)
(state may prosecute acts performed outside of its jurisdiction
where acts are intended to produce and actually produce detrimental
effects within the state)).
 Woodward asserts that the government failed to produce
any evidence of detrimental effect actually resulting from the out-
of-state expenditures; the "mere possibility of future action
favorable to Hancock is not an 'effect,' let alone one that is
'substantial.' Nor would alteration of official acts be the
'direct' or 'foreseeable' result of lobbyists entertaining
legislators at out-of-state conferences." Def. Br. at 33 (citing
Sawyer, 85 F.3d at 741). We disagree.
 The Massachusetts gratuity statute prohibits public
employees from receiving "anything of substantial value . . . for
or because of any official act . . . performed or to be performed
by him." Mass. Gen. Laws ch. 268A, 3. "The concern behind the
gratuity statute, like the bribery statute, is the potentialundermining of official integrity." Sawyer, 85 F.3d at 735
(emphasis added). Indeed, when someone gives a stream of illegal
gratuities to a public official, a sense of being beholden to the
giver's interests is exactly the kind of influence that the giver
is trying to develop. See id. at 730. The potential effect on
Massachusetts when one of its own legislators accepts gratuities
out-of-state paid by someone with an interest in Massachusetts
legislation is a sufficient nexus to satisfy the effects test and
give Massachusetts jurisdiction to prohibit such conduct. 
 Besides this potential effect, of course, Woodward's
receipt of gratuities in Florida was linked also to his official
acts in Massachusetts. Among these acts is his recommittal of a
particular bill, Senate Bill 641 (S. 641), shortly after he
returned from Florida, as already discussed. And they also
included his prior acts to champion the insurance industry's
positions in the Legislature. Woodward violated the Massachusetts
gratuity statute, a prerequisite for his Travel Act violation,
because he received something of "substantial value . . . for or
because of any official act . . . performed or to be performed by
him." Mass. Gen. Laws ch. 268A, 3. We have already discussed
our view that the evidence was sufficient to establish the linkage
beyond a reasonable doubt. 
 Woodward's Florida gratuity was closely enough related to
Massachusetts that his "effects doctrine" argument must fail. SeeStrassheim, 221 U.S. at 284-85 (holding that, when an individual's
criminal acts were intended to and did produce detrimental effects
within a state, the state may prosecute that individual even if he
commits the act in another jurisdiction; applying this rule to an
attempt to bribe a Michigan official who was in charge of making
state purchases, even though defendant never entered Michigan);
Heath, 941 F.2d at 1138-39. As the district court noted, to hold
otherwise would "be at odds with the idea of official bribery or
corruption . . . . [It would] provide a series of safe havens for
those who wish to be bribed or [to be] the recipients of
gratuities. [It would be] at odds with the statute itself [and]
with the larger purposes of the Travel Act."
 F
 Conspiracy (Count 1)
 In order to convict Woodward of conspiracy, the
government had to prove that a conspiracy existed, that Woodward
knew of and voluntarily participated in it, and that an overt act
took place in furtherance of it. See United States v. Frankhauser,
80 F.3d 641, 653 (1st Cir. 1996). The agreement need not be
explicit; a tacit agreement will suffice. See id.; Direct Sales
Co. v. United States, 319 U.S. 703, 712-13 (1943). To establish
Woodward's voluntary participation in the conspiracy, the evidence
must establish both his intent to agree and his intent to
effectuate the object of the conspiracy. Frankhauser, 80 F.3d at
653; see also United States v. Piper, 35 F.3d 611, 615 (1st Cir.
1994). Neither the agreement nor Woodward's participation in it
need be proven with direct evidence. See Glasser v. United States,
315 U.S. 60, 80 (1942); Frankhauser, 80 F.3d at 653. 
 Woodward's challenge to his conspiracy conviction is that
it depends on the three substantive counts on which he was
convicted, and he maintains that those counts suffered from
sufficiency of the evidence infirmities that compel acquittal. 
"Because these infirmities extend to the conspiracy count," he
argues, "Count 1 must fall for the same reasons as the three
substantive counts of which it is comprised." Def. Br. at 34.
 Woodward's argument is unavailing, because we have
concluded that none of the three substantive counts comprising the
conspiracy count was infirm. Therefore, the evidence is sufficient
to support the conspiracy conviction for the same reasons discussed
supra concerning the substantive counts, and Woodward's conspiracy
conviction must stand.
 Based on the evidence in this record, we conclude that a
reasonable jury could have found, beyond a reasonable doubt, that
Woodward committed all elements of the four offenses of which he
was convicted.
 III
 Jury Instructions
 Woodward contends that the district court erred in
instructing the jury as to the intent necessary to support a
conviction, contrary to our decision in Sawyer. Such a challenge
to the jury instructions presents legal issues which we review de
novo. United States v. Phath, 1998 WL 244746, at *2 (1st Cir.
May 20, 1998); United States v. Pitrone, 115 F.3d 1, 4 (1st Cir.
1997) (When the alleged error involves the instructions' adequacy
in explaining the law, such as "interpretation of the elements of
a statutory offense, it poses a question of law and sparks plenary
review."); United States v. Fulmer, 108 F.3d 1486, 1494 (1st Cir.
1997). We must look at the entire charge, in light of the
evidence, and determine whether, taken as a whole, the court's
instructions "fairly and adequately submit[ted] the issues in the
case to the jury," United States v. Cassiere, 4 F.3d 1006, 1022
(1st Cir. 1993) (internal quotation marks omitted), or whether they
"tended to confuse or mislead the jury" as to the applicable
principles of law, Sawyer, 85 F.3d at 726 (internal quotation marks
omitted); see Fulmer, 108 F.3d at 1494.
 The district court is not obligated to "follow the exact
form and wording of the defendant's proposed instructions." United
States v. Gibson, 726 F.2d 869, 874 (1st Cir. 1984); Lawrence v.
Gulf Oil Corp., 375 F.2d 427, 429 (3d Cir. 1967). Rather, "[t]he
trial court has considerable latitude in charging the jury," so
long as the charge as a whole fairly and adequately limns the law
applicable to the controlling issues. Cassiere, 4 F.3d at 1022
(internal quotation marks omitted). That latitude is not
unlimited, however. Clear, accurate, easily understood jury
instructions are "vitally important in assuring that jurors grasp
subtle or highly nuanced legal concepts." United States v.
DeStefano, 59 F.3d 1, 4 (1st Cir. 1995). In Sawyer, in order to
protect a defendant from being convicted based on conduct that was
not actually illegal, we reversed the conviction and mandated a
protective instruction in cases such as this one. 
 In the present case, Woodward challenges the district
court's instruction on the issue that the court and the parties
referred to as the issue of "mixed motive." Proof of motive is
not an element of the offenses. The phrase "mixed motive" was
apparently meant as shorthand for the dual intent that might be
supportable by the evidence in this case: the jury could have
concluded (1) that Woodward accepted expenditures based on his
legitimate friendship with Sawyer, or (2) that these were unlawful
expenditures to influence official action (or some combination of
the two).
 Woodward argues that our decision in Sawyer intended to
draw a bright line between "the merely unattractive and actual
criminal conduct." Sawyer, 85 F.3d at 741. On one side of the
line, according to Woodward, is conduct that is "unattractive" or
even "reprehensible" but is not illegal as a matter of federal
criminal law. This would include lavish hospitality if intended to
cultivate business or political relationships or friendships. On
the other side of the line is illegal expenditures, i.e., those by
lobbyists intended "to cause the recipient to alter her official
acts." Id. According to Woodward, Sawyer presented this analysis
"largely in stark 'either-or' terms." Def. Br. at 35. He claims
to have premised "the core" of his defense on this "bright line"
distinction, attempting to persuade the jury that Woodward and
Sawyer's relationship should be found "to fall on the 'friendship'
side of the line," because of the family friendship and the social
nature of the functions at which the expenditures were made. Id.at 38.
 Woodward's theory of the case is flawed, based on a
misreading of our decision in Sawyer. Relationships among human
beings, especially among lobbyists and elected officials, will
frequently not follow a bright-line pattern, falling on one side or
the other of some magical wall dividing friendship from attempts at
undue influence. A lobbyist and legislator may initially have an
exclusively business relationship when they first meet, but if it
continues over time, given the nature of the lobbying business with
its sometimes "lavish hospitality," Sawyer, 85 F.3d at 741, the
individuals involved may eventually get to know each other, and
some may be able to claim, with some truth, that their relationship
has become one of friendship. We did not imply anything different
in Sawyer, and we certainly did not state or imply what Woodward's
theory seems to entail: that the formation of a friendship between
a lobbyist and a legislator somehow insulates both from prosecution
for honest services fraud.
 A look at Sawyer's language illustrates Woodward's error. 
We stated: "[I]f the aim of the lobbyist were simply to cultivate
a business or political 'friendship' with the legislator," then
payments for entertainment would not constitute a violation of the
Travel Act or the mail or wire fraud statutes. 85 F.3d at 741
(emphasis added). To so hold that conduct is not illegal if it
is "simply" to cultivate a friendship does not immunize dual
intent conduct. The word "simply" carries the import of "solely." 
A dual intent that seeks both to cultivate friendship and to
illegally influence official acts is not a purpose that is "simply"
to promote friendship. Such a dual purpose is not insulated from
criminal liability merely because, in Sawyer, we were careful to
protect a purpose that is "simply" to promote friendship.
 Similarly, in Sawyer we said: "[I]f Sawyer had this
limited intent to cultivate friendship rather than to influence
an official act the federal statutes here involved would not be
violated." Id. (emphasis added). An intent "limited" to promoting
friendship does not include an intent that also has a second
purpose. The words "rather than" when juxtaposed in this way
against the "limited intent" language imply that an intent to
influence cannot be part of one's intent if one seeks the Sawyerimmunity.
 After discussing an intent limited to the cultivation of
business or friendship, Sawyer went on to say that: "Only if
instead or in addition, there is an intent to cause the recipient
to alter her official acts may the jury find a theft of honest
services or the bribery predicate of the Travel Act." Id. at 741
(emphasis added). Woodward's argument addresses the "instead"
portion of the disjunctive, but Woodward offers no basis for
reading the highlighted words out of our holding in Sawyer. The
quoted sentence clearly contemplates, not a "bright line" or
"either-or" dichotomy (Def. Br. at 37-38), but the possibility that
a defendant may be prosecuted if he possesses a dual intent, an
illegal intent "in addition" to a legal "friendship" intent. 
 Thus, Sawyer's language does not mean what Woodward would
like it to mean that conduct must have an exclusively illegalintent in order to be subject to the criminal laws. Rather, it
means only that conduct may not be subject to the criminal laws if
the intent underlying it is exclusively legal. A defendant may be
prosecuted for deprivation of honest services if he has a dual
intent, i.e., if he is found to have intended both a lawful and an
unlawful purpose to some degree. If the jury finds that an
unlawful purpose was present, it may convict the defendant.
 The Third Circuit reached a similar conclusion in United
States v. Greber, 760 F.2d 68, 72 (3d Cir. 1985). As Woodward
noted, the jury in Greber "was instructed similarly to the present
case, making any amount of inducement, however small, illegal." 
Def. Br. at 39 n.27; see Greber, 760 F.2d at 72. In United Statesv. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20 (1st
Cir. 1989), we noted that we were "impressed with the Third
Circuit's reasoning" in Greber. Bay State, 874 F.2d at 29-30. 
Likewise, the Second Circuit has "noted that there could be dual
purposes for payments, stating that a 'valid purpose that partially
motivates a transaction does not insulate participants in an
unlawful transaction from criminal liability.' The charge was
entirely appropriate in light of [the defendant's] argument that he
was motivated by friendship." United States v. Coyne, 4 F.3d 100,
113 (2d Cir. 1993) (rejecting challenge to jury instruction that
defendant must be found to have accepted or solicited a thing of
value "at least in part" for or because of his intent to be
influenced) (citing Biaggi, 909 F.2d at 683); see also Anderson v.
United States, 417 U.S. 211, 226 (1974) (conspiracy).
 Therefore, the answer to Woodward's assertion that "[t]he
district court's instruction should . . . have parroted Sawyer,"
Def. Br. at 38, is that, for all relevant purposes, it did. The
district court instructed the jury, inter alia, as follows:
 You may not find that the defendant violated
 either set of federal laws which I have
 described to you if his receipt of the
 expenditures was solely part of a routine
 cultivation of a business or political
 friendship rather than an intent on his part
 to be influenced in his official legislative
 duties. If instead or in addition, there is
 an intent on the defendant's part to be
 influenced in his official legislative duties,
 then you may find a violation of either set of
 federal laws. If there is both the intent to
 cultivate a business and political
 relationship and the intent to be influenced
 in official legislative duties, then you may
 find a violation of the federal laws.

 Woodward would have us go beyond Sawyer in the present
case. He insists that the real issue here is the degree of
unlawful intent necessary in a dual intent case to permit or
sustain a conviction, and the necessary jury charge on that point. 
Woodward argues that the protective instruction we set forth in
Sawyer should be modified to say that an illegal purpose must be at
least "one of the [scheme's] several dominant purposes," Def. Br.
at 40 (quoting United States v. Ellis, 935 F.2d 385 (1st Cir. 1991)
(Mann Act)) (emphasis added). Otherwise, under our reading of
Sawyer, a de minimus illegal intent could result in a conviction
even if it were dwarfed by a perfectly legal "friendship" intent.
 According to Woodward, the illegal purpose of the
gratuity should not be a minor or incidental portion of the mix. 
We disagree. The criminal law may punish conduct even if its
illegal purpose is incidental to other, legal purposes. SeeAnderson, 417 U.S. at 226 (holding that the purpose to violate
federal law may be a secondary purpose, not necessarily primary);
United States v. Ellis, 595 F.2d 154, 162 (3d Cir. 1979) ("While
[Supreme Court cases] require such a specific intent [to violate
constitutional rights], they do not require that the immediate
intent to violate constitutional rights predominate over the
ultimate purposes which that violation is designed to achieve."). 
 We will assume nevertheless that Woodward is correct that
a conviction should not stand if the illegal intent is de minimusor insignificant. But this does not mean that the district court
erred in failing to give an instruction as to the "de minimus"
point. The law may require a certain degree of illegal intent in
order to convict, but it does not follow that an explicit
instruction on that point is necessary. In the present case, even
if the instructions were not technically adequate because they
lacked an explicit "de minimus" instruction, Woodward was not
prejudiced thereby. "An error in jury instructions will warrant
reversal of a judgment only if the error is determined to have been
prejudicial, based on a review of the record as a whole." Davetv. Maccarone, 973 F.2d 22, 26 (1st Cir. 1992). As we have already
discussed in Part III, there is no evidentiary basis in this record
for Woodward's implicit contention that he had no more than a de
minimus degree of intent to defraud the public of his honest
services. Therefore the omission of explicit "de minimus" language
from the jury instructions even if erroneous did not prejudice
Woodward, and any error does not warrant reversal of his
conviction. See Davet, 973 F.2d at 26.
 IV
 Super Bowl Evidence
 Woodward appeals the denial of his motion in limine to
exclude evidence that Hancock, through Sawyer, paid for a 1986 trip
for Woodward and his wife to the Super Bowl in New Orleans. The
court permitted the government to introduce evidence concerning the
Woodwards' receipt of $1,809 worth of airfare, lodging, and tickets
to the game. After admitting such evidence, the court gave a
limiting instruction to the jury. 
 Woodward objects that this particular gratuity involved
more money and was different in kind than the gratuities on the
basis of which he was convicted: it included payment for airfare
and lodging, whereas all other gratuities were limited to meals,
golf, and other forms of entertainment. He also points out that
the statute of limitations precludes Woodward from being charged
with crimes committed prior to July 27, 1990, and that 18 U.S.C.
 1346 was not even enacted until November 18, 1988. For these
reasons, Woodward claims that the admission of the Super Bowl
evidence was of limited probative value, and that whatever
probative value it did have was substantially outweighed by the
danger of unfair prejudice. He argues that it should have been
excluded under Fed. R. Evid. 403. 
 Under Rule 403, "if the evidence brings unwanted baggage,
say, unfair prejudice or a cognizable risk of confusing the jury,
and if the baggage's weight substantially overbalances any
probative value, then the evidence must be excluded." United
States v. Aguilar-Aranceta, 58 F.3d 796, 800 (1st Cir. 1995)
(internal quotation marks omitted). "The damage done to the
defense is not a basis for exclusion; the question under Rule 403
is one of unfair prejudice -- not of prejudice alone." United
States v. Munoz, 36 F.3d 1229, 1233 (1st Cir. 1994) (internal
quotation marks omitted). We review trial court rulings under Rule
403 for abuse of discretion. See United States v. Fulmer, 108 F.3d
1486, 1497 (1st Cir. 1997); Aguilar-Aranceta, 58 F.3d at 800.
 We note first that, while Woodward is concerned that this
particularly expensive gratuity might prejudice the jury because of
its amount, he neglects to mention the coincidence in the timing: 
the Super Bowl took place shortly after Woodward became chair of
the Insurance Committee, which happened to be a position from
which he could potentially be of great use to Sawyer and Hancock. 
The government argues, with some force, that the Super Bowl
gratuity, elaborate as it was, established and set the tone for the
ongoing relationship, i.e., a conspiracy to trade valuable gifts
for influence, to deprive Woodward's constituents of his honest
services. Once the nature of the relationship was established,
ongoing gifts could be given in smaller amounts in order to "keep
the wheels greased." Thus, the Super Bowl evidence has a good deal
more probative value than Woodward suggests. And its prejudicial
effect is far less: accepting tickets to the Super Bowl is not so
heinous or outrageous that the jury was likely to be inflamed
against Woodward and ignore the arguments presented in his
defense, thereby risking a conviction based on passion rather than
on the evidence. Cf. United States v. Bartelho, 129 F.3d 663, 677-
78 (1st Cir. 1997) (affirming admission of plans to escape from
prison at trial on bank robbery); Pitrone, 115 F.3d at 7-8
(admitting evidence of defendant's boasting about 40 prior
commissions of the same crime); United States v. Rivera, 83 F.3d
542, 545-47 (1st Cir. 1996) (evidence that defendant raped victim
admissible at trial on carjacking charge); United States v.
Manning, 79 F.3d 212, 217-18 (1st Cir.), cert. denied, 117 S. Ct.
147 (1996) (admitting evidence of prior drug dealing at trial on
current drug trafficking charges); United States v. Cruz-Kuilan, 75
F.3d 59, 61 (1st Cir. 1996) (affirming admission of evidence that
victim died of gunshot wounds at trial for carjacking); United
States v. Lombard, 72 F.3d 170, 190 (1st Cir. 1995) (evidence
relating to murder, of which defendant had previously been
acquitted, admitted at trial on firearms violations).
 In Sawyer, we noted the district court's decision to
admit the same Super Bowl evidence to prove "Sawyer's state of mind
with respect to the alleged scheme to defraud." 85 F.3d at 721
n.1. We observed that the court had instructed the jury, as the
district court did here, that these events took place prior to the
time indictable under the statute of limitations, but that such
evidence was probative of the defendant's (there, Sawyer's) state
of mind. In Sawyer, we did not address the propriety of admitting
this evidence because Sawyer had not challenged it as Woodward has
here. In this case, we hold that the district court properly
admitted this evidence, to prove Woodward's intent and the nature
of the conspiracy.
 V
 Conclusion
 In this case, the jury instructions adequately conveyed
to the jury the difference between conduct that is legal and
conduct that violates the criminal laws. The evidence was
sufficient to enable a rational jury to conclude beyond a
reasonable doubt that Woodward was guilty of the four counts on
which he was convicted, and no ground for error has been found. 
The judgment of the district court is affirmed.